MADELEINE M. LANDRIEU, Judge.
| jThis case arises out of the performance of a publicly-bid construction contract awarded to Guy Hopkins Construction Co., Inc. [“Hopkins”] by the St. Bernard Port, Harbor and Terminal District [“the Port”]. Both parties appeal the trial court’s September 6, 2011 judgment, which awarded Hopkins damages in the amount of $101,316.47. For the reasons that follow, we affirm.
FACTS AND PROCEEDINGS BELOW
Approximately twelve years ago the Port solicited bids for Phase I of a major public works renovation [“the Project”]. Hopkins submitted the lowest bid and was awarded the Project. On August 7, 2000, Hopkins entered into a construction contract with the Port in the amount of $3,441,252.00. The contract specified that all work was to be completed within 150 days. The specified work consisted of the demolition and removal of existing structures in the fifty-acre Project area, the placement of sand that was to be compacted, graded, and coated with a layer of base course (crushed limestone), and the installation of water/sewer and drainage pipes and certain prep work for an electrical system to be installed in |2the second phase of the renovation.[1] The Port issued the Notice to Proceed on August 15, 2000. Due to several negotiated extensions of time, the Project was due to be completed on September 14, 2001. The parties disagree as to what happened next. Hopkins contends it completed the final punch list for the Project but the Port refused to issue payment. Conversely, the Port claims that Hopkins abandoned the unfinished Project on December 10, 2001. After placing Hopkins in default, the Port terminated Hopkins on February 7, 2002.
On April 18, 2002, the Port filed suit against Hopkins and its liability insurers for breach of contract and damages, Hopkins filed a reconventional demand against the Port seeking the balance due under the contract and compensation for additional work it allegedly had performed. *878 Hopkins also asserted a third party demand and reconventional demand against the Project Engineer, Burk-Kleinpeter, Inc. [“BKI”], seeking damages for delays that allegedly resulted from deficiencies in the design and administration of the Project. Hopkins’s claim against BKI was settled prior to trial. In addition, Hopkins, its insurers and the Port reached a partial settlement, leaving only certain claims to be decided at trial, including Hopkins’s claims for the contract balance[2] and other amounts allegedly due it for several items of additional work, and the Port’s claims for allegedly defective work and for liquidated damages.
|aThe case was tried on multiple dates over a five-year period, namely: May 31-June 1, 2005; February 27-March 2, 2007; January 28-80, 2008; September 30-Octo-ber 2, 2008; January 7-8, 2009; and February 18, 2009. After taking the matter under advisement, the trial court on March 12, 2010 rendered judgment in favor of the plaintiff, the Port, in the amount of $357,765.19 and issued extensive written reasons for judgment. Both parties filed motions for new trial on specific issues, which the trial court granted. After conducting a hearing on those issues, the trial court, on September 1, 2011 rendered judgment against the Port, awarding the defendant, Hopkins, damages in the amount of $59,538.47. A few days later, on September 6th, the trial court on its own motion amended the judgment to correct “an error in computation.” The amended judgment increased Hopkins’ award to $101,306.47. On September 7th, the trial court issued extensive written reasons addressing all the issues covered by the three successive judgments.
In its Reasons for Judgment, the trial court noted several general findings of fact that precipitated its rulings as to specific items of recovery between the parties The court noted that Hopkins was the lowest bidder on the Project by approximately $2,000,000.00, a margin that prompted the Port to inquire as to whether Hopkins was aware of the scope of the Project. After ignoring the Port’s suggestion that it reconsider its bid, Hopkins was awarded the Project and soon discovered that it involved more extensive work than Hopkins had originally contemplated. The court specifically noted that the Hopkins employee responsible for formulating the bid was fired shortly thereafter. Two major issues faced by | ¿Hopkins were an extensive amount of concrete demolition and problems with the concrete crushing operations. The delays caused by these issues were compounded by a continuous change by Hopkins in supervisors for the Project, as well as “continuous machinery, manpower and management problems” that persisted throughout the Project. The trial court found that, in order to keep the work progressing, the parties had agreed upon three change orders during the course of the Project, all of which had amended the contract. Finally, the court found that the Engineer, BKI, which was a party to the contract, had served as the “initial interpreter of [the contract] requirements” in deciding upon the acceptability of the work. The trial court specifically noted that any claims of Hopkins or the Port that could have been brought against the Engineer had been assumed by Hopkins via its settlement with BKI.
After setting forth these general findings, the trial court addressed nineteen specific claims for compensation by Hopkins and six by the Port, providing its reasons for granting or denying each amount. The court explained that the final award to Hopkins was determined by *879 calculating the difference between the amounts awarded to the Port and those awarded to Hopkins, which resulted in the Port owing Hopkins the sum of $101,306.47.
Hopkins appeals the judgment,[3] raising ten assignments of error. The Port has filed an answer to the appeal. It asserts a cross-appeal raising five assignments of error.
_y_ISSUES
For purposes of this discussion, the parties’ fifteen specific assignments of error are grouped into the following five general issues:
I. Whether the Port is entitled to compensation for various items of work that it claims Hopkins either failed to perform satisfactorily or failed to complete as per the terms of the contract;
II. Whether Hopkins is entitled to compensation for its performance of various items of additional work that it claims were outside the scope of the contract;
III. Whether Hopkins is entitled to the unpaid balance of the contract, subject to deductions for specific instances of deficient or incomplete performance;
IV. Whether the Port is entitled to liquidated damages in the amount awarded;
V. Whether the Port is entitled to attorney fees.
STANDARD OF REVIEW
It is well settled that a court of appeal may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). However, where one or more | (¡errors of law made by the trial court have interdicted the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record. Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98), 708 So.2d 731, 735 (citations omitted). A legal error occurs when a trial court applies incorrect principles of law, and the error is prejudicial. Id. Legal errors are prejudicial when they materially affect the outcome of a case and deprive a party of substantial rights. When such a prejudicial error of law skews the trial court’s finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Id.
A contract is the law between the parties to it, and the courts are obliged to give legal effect to such contracts according to the common intent of the parties. La. C.C. art. 2045; Belle Pass Terminal Inc. v. John, Inc., 92-1544, 1545, p. 16 (La.App. 1 Cir. 3/11/94), 634 So.2d 466, 479. The parties’ intent is to be determined by the words of the contract when they are clear, explicit and lead to no absurd consequences. La. C.C. art. 2046; R.J. Messinger, Inc. v. Rosenblum, 2003-2209, 2210, pp. 7-8 (La.App. 4 Cir. 5/11/05), 904 So.2d 760, 765. In such a case, the *880 meaning and intent of the parties to a written contract must be determined as a matter of law from the four corners of the instrument without resorting to extrinsic evidence. Martin Exploration Co. v. Amoco Production Co., 93-0849 (La.App. 1 Cir. 5/20/94), 637 So.2d 1202, 1205. If, however, the meaning of a 17contractual provision is doubtful, the provision must be interpreted in light of considerations such as “the nature of the contract, equity, usage, and the conduct of the parties before and after the formation of the contract.” La. C.C. art. 2053.
In the present case the trial court made numerous, detailed factual findings based upon its consideration of thirteen days of testimony spread out over a five-year period and the submission of voluminous documentary evidence; including the contract, which exceeds two hundred pages in length. Both parties seek a de novo review, arguing that the manifest error standard does not apply here because the trial court committed legal errors in interpreting various provisions in the contract. The parties disagree, however, as to what provisions of the contract have been misinterpreted. Reviewing the record, we do not find that the trial court made any legal error so substantial that it tainted the fact-finding process and rendered the entire matter subject to de novo review. Therefore, we have reviewed this matter according to two different standards, applying the legal correctness standard to the trial court’s interpretations of the contractual language and the manifest error standard to the trial court’s findings of fact.
DISCUSSION
I. Whether the Port is entitled to compensation for allegedly unsatisfactory and/or incomplete work by Hopkins
In this category, Hopkins challenges the amounts awarded to the Port for the cost of base course material not placed by Hopkins, the cost of removing certain utility poles, and the cost of reinstalling a sewer line. Additionally, the Port | ^challenges the trial court’s refusal to award it compensation for excess sand allegedly placed by Hopkins; Hopkins’s alleged overbilling for concrete demolition and removal; and the leveling and compacting of the excess sand placed by Hopkins.
Before addressing these six specific items, however, we first address Hopkins’s arguments that the trial court committed two errors of law: (1) by misinterpreting a provision in the contract that should have precluded the Port from recovering any damages for work allegedly not completed by Hopkins; and, alternatively, (2) by improperly relieving the Port of its burden to prove its claims for defective work.
Hopkins first argues that the Port should not be compensated for any completion costs because these items were outside the original contract and were neither approved by BKI nor incorporated into a change order. The applicable provision of the contract is contained in Article 15, entitled “Suspension of Work and Termination.” The article lists the causes for which the Owner may terminate the contract and permits the Owner (the Port), after providing the requisite notice of termination, to:
... finish the Work as OWNER may deem expedient. In such case CONTRACTOR shall not be entitled to receive any further payment until the Work is finished. If the unpaid balance of the Contract Price exceeds the direct, indirect and consequential costs of completing the Work (including but not limited to fees and charges of engineers, architects, attorneys and other professionals and court and arbitration costs) such excess will be paid to CONTRACTOR. If such costs exceed such unpaid balance, CONTRACTOR shall pay the *881 difference to OWNER. Such costs incurred by OWNER will be approved as to reasonableness by ENGINEER and incorporated into a Change Order, but when exercising any rights or remedies under this |aparagraph OWNER shall not be required to obtain the lowest price for the Work performed. [Emphasis supplied.]
Citing the highlighted language, Hopkins argues that there was no evidence that BKI approved or incorporated into a change order the completion work that the Port hired other contractors to perform after Hopkins abandoned the Project. Because of the absence of such evidence, Hopkins contends the Port is not entitled to any reimbursement for the completion work.
We disagree. There is nothing in the contract to suggest that the absence of the Engineer’s approval or change order serves as a complete bar to recovery by the Owner for completing the work, especially where, as the trial court found here, the Contractor has abandoned the project.[4] In fact, a reading of the entire contract refutes that any such meaning was intended. In Article 14, entitled “Substantial Completion,” the words of the contract are clear and explicit regarding the Contractor’s continuing obligation to perform. Section 14.15 states, in pertinent part:
CONTRACTOR’S obligation to perform and complete the Work in accordance with the Contract Documents shall be absolute. Neither recommendation of any progress or final payment by ENGINEER, nor the issuance of a certificate of Substantial Completion, nor any payment by OWNER to CONTRACTOR ... nor any act of acceptance by OWNER ... nor any correction of defective Work by OWNER will constitute an acceptance of work not in accordance with the Contract Documents or a release of the CONTRACTOR’S obligation to perform .... [Emphasis in the original]
The trial court found the amounts awarded for completion costs to be reasonable after hearing all the evidence. Moreover, insofar as the failure to approve the costs for reasonableness or incorporate them into a change order is attributable to BKI, Hopkins’s settlement with BKI precludes the raising of this issue.
[ mHopkins next argues that the trial court failed to place the burden of proof upon the Port to show the existence of defective work and the cost to repair same. Hopkins cites Schiro-Del Bianco Enterprises, Inc. v. NSL, Inc., 99-1237 (La.App. 4 Cir. 5/24/00), 765 So.2d 1087, for the proposition that once a contractor has substantially performed under a construction contract, the owner bears the burden of proving the existence of defective work. This argument is without merit. There is nothing in the record to indicate that the trial court improperly allocated the burden of proof between the parties. The record confirms that the trial court properly placed the burden on the Port to prove its claims of breach by Hopkins, including the existence of defective and/or unfinished work and the costs to repair or complete this work, and placed the burden on Hopkins to prove the claims it raised by recon-ventional demand, such as its entitlement to the balance due on the contract.
We therefore reject Hopkins’s contention that the trial court committed legal error either by misinterpreting the contract or by misalloeating the burden of *882 proof. We now turn to the factual errors allegedly made by the trial court.

A. Cost of base course material not placed by Hopkins

The trial court awarded the Port the amount of $162,750.00 to compensate it for 10,500 cubic yards of base course the Port ordered to be placed at the site by another contractor after Hopkins abandoned the project. The trial court reasoned that under the contract, the Port had the right to require Hopkins to provide 125% of the amount of base course specified therein (which amount was 30,000 cubic Inyards according to the last Change Order) at $20.50 per cubic yard. When it abandoned the project, Hopkins had placed a total of 27,000 cubic yards of base course out of the 37,500 cubic yards (125% of 30,000) the Port was entitled to, a difference of 10,500 cubic yards of base course. Jerry Graves, the Port’s project manager, testified that Hopkins refused to place base course in the North stack area, and the Port eventually paid another contractor $36.00 per cubic yard of base course to do so. The trial court specifically noted that the Engineer had requested that Hopkins place additional base course by letter dated August 22, 2001, but Hopkins had refused to comply. The trial court therefore awarded the Port the difference in price ($15.50 per cubic yard) multiplied by 10,500 yards.
Hopkins argues that the trial court erred in making this award because it was only instructed to place base course in the South area of the project, not the North area. However, the testimony of Mr. Graves and our reading of the August 22, 2001 letter contravene this argument. We do not find the trial court’s award of this amount to be manifestly erroneous.

B. Removal of utility poles

The trial court awarded the Port $20,203.00 to compensate it for the cost of removing certain utility poles that Hopkins had not removed. Hopkins contends that the contract language afforded Hopkins the discretion to determine which poles conflicted with its construction operations and, therefore, should be removed. In support of this contention, Hopkins points to an August 13, 2001 letter written by Jason Keller, the project supervisor for Hopkins, which informed the Engineer 112that because no poles had been designated for removal in the plans, Hopkins would remove only those poles that prevented its work from progressing. Hopkins further contends that in addition to those poles, it also removed certain other poles that the Port verbally directed it to remove, for which Hopkins seeks additional compensation in the amount of $7,443.00.
Hopkins’ argument is not supported by the words of the contract. The contract describes the “Work” as consisting of “the removal and satisfactory disposal or relocation of all existing manholes, pipe, driveways, sidewalks, disconnected utility poles, fences, culverts, pavements, buildings ... and all other miscellaneous structures and obstructions which conflict with construction applications and are not designated to remain, or are indicated on the Contract Drawings to be removed.” This language does not indicate that Hopkins had the sole discretion to determine which poles should be removed; nor does it indicate that Hopkins would be entitled to extra compensation if the Port and/or the engineer disagreed with Hopkins’ determination and directed Hopkins to remove more poles. Moreover, the testimony of Jerry Graves confirmed that, as this was a demolition project, Hopkins was supposed to remove all poles in the way of the Project, not just those in Hopkins’s way. The trial *883 court noted that Hopkins’s own supervisor, Steve Price, agreed with this assessment of Hopkins’s responsibility.
The trial court, found, as a matter of fact, that Hopkins breached the contract by failing to remove all utility poles in the way of construction. The record supports this finding. Thus, we find no manifest error in the trial court’s ruling and | isdecline to disturb the award to the Port. For the same reason, we also decline to award Hopkins the additional compensation it seeks.

C. Reinstallation of sewer line

The trial court awarded the Port $33,345.00 to compensate it for having to reinstall a sewer line after discovering that Hopkins had improperly laid the line “with a ‘belly.’ ” Hopkins contends the Port did not submit any documentation to support its claim that the foundation material for the line had collapsed. Additionally, Hopkins contends it should not have to pay for this item because the reinstallation incorporated a different design with a different foundation.
The Port cites the contract, which required Hopkins to dig the trench and install the sewer line so that it would properly drain. Hopkins was charged with selecting the means to accomplish this end. The evidence confirms that Hopkins suggested that railroad ballast be used for the bedding, and that this request was approved by the Engineer with the instruction that Hopkins was to notify the Engineer if soil conditions changed such that the soil would not support the ballast. Hopkins never notified the Engineer of any problems with support for the sewer line. However, after Hopkins abandoned the Project, the Port discovered that the line backed up with waste and did not drain. The evidence also showed that the line sagged. The Port submitted invoices showing the costs it incurred to have the line tested and repaired.
|14We find no manifest error in the trial court’s determination that Hopkins failed to properly install the sewer line as per the terms of the contract. We therefore decline to disturb this award.

D. Excess sand placed by Hopkins

The trial court denied the Port’s claim seeking compensation in the amount of $127,544.00 for 12,780 cubic yards of excess sand that was left at the Project site when Hopkins abandoned the job. The Port seeks reimbursement for the amount it paid for the sand and the cost of moving it to another area. The trial court found as a matter of fact that the Port had continually requested more sand, and that, after Hopkins had abandoned the job, the Port had kept the sand and actually used it.
The Port argues on appeal that Hopkins bore the contractual responsibility to calculate the amount of sand needed. The Port also contends that it was Hopkins that had continually requested more sand, but acknowledges that the Port approved these requests. Finally, the Port argues that pursuant to the bid documents for the contract, Hopkins was only entitled to be paid for the amount of sand it actually used, which amount was not able to be determined by the Port until after Hopkins had abandoned the Project. Hopkins argues that it would be unjust enrichment for Hopkins to be required to reimburse the Port for sand the Port kept and used, and further, that the Port failed to submit documentation of the costs it allegedly incurred to move the sand.
11fiThe contract does not clearly delineate which party should bear the cost of excess sand that was obtained but not used for the Project. Moreover, the Port did *884 not meet its burden of showing that the amount of sand obtained was excessive, considering that Hopkins abandoned the project before it was completed. Because the Port approved the amount of sand ordered, kept it, and actually used it, we find no manifest error in the trial court’s denial of the Port’s reimbursement claim. We therefore decline to disturb the trial court’s ruling in this respect.

E. Concrete demolition and removal

The trial court denied the Port’s claim seeking reimbursement in the amount of $310,786.66, which sum Hopkins allegedly overbilled the Port for concrete that was demolished and removed from the Project site. The Port contends this claim was wrongfully denied.
It is undisputed that Hopkins was to be paid a per-unit price for each ton of concrete that was demolished and hauled away. The Port’s claim for reimbursement is based upon its contention that the trucks used to haul away the concrete actually contained a mixture of concrete, dirt and sand; the Port contends that the inclusion of substances other than concrete increased the weight that Hopkins used to calculate the payment owed by the Port. In support of its claim, the Port introduced photographs of huge piles of concrete mixed with soil at the site and the testimony of various witnesses that the trucks being used for concrete removal also contained soil and mud. The Port had engineer Peter Burk calculate the amount Hopkins allegedly overbilled for concrete. In addition, the Port | ^introduced the minutes of numerous progress meetings in an attempt to show that a settlement reached in November, 2000, for the soil-charged-as-concrete had only applied to that particular month, and that the Port representatives had continued to complain about the same issue at subsequent meetings.
The trial court found that the Port had failed to meet its burden of proving that there was an overabundance of dirt in the demolished concrete that was weighed. The trial court additionally found that the minutes of the weekly meetings indicated that the Port had foregone its objections with respect to this issue.
At trial, Hopkins submitted into evidence logs and scale tickets, which were approved and paid by the Port, for the demolished concrete. The record does not demonstrate that the trial court committed manifest error by finding that the Port failed to present sufficient proof of this claim. We therefore decline to disturb the trial court’s ruling in this regard.

F. Leveling and compacting of excess sand

The trial court denied the Port’s claim seeking compensation in the amount of $41,778 for leveling and compacting of the excess sand Hopkins left at the site. The Port contends this claim was proved at trial by the evidence it submitted, which included payment requests by the contractor the Port hired to do re-compacting and fine grading of certain areas of sand. The trial court found that this claim was “justified” by the fact that piles of sand were left on the site by Hopkins when it abandoned the Project. However, the trial court denied the claim |17on the basis that the Port failed to produce sufficient proof of the cost of leveling and compacting this sand. For its part, Hopkins argues that the trial court’s ruling is correct because the Port failed to produce any documentation or evidence showing that the grading done was necessary.
We find no manifest error in the trial court’s ruling that the invoices submitted by the Port are not sufficient to prove this claim. We therefore decline to disturb that ruling.
*885 II. Whether Hopkins is entitled to be compensated beyond the contract price for additional work it allegedly performed

A. Handling of berm material

The trial court denied Hopkins’s claim seeking additional payment in the amount of $119,199.00 for its having to move berm material twice on account of a design change made by the Port. Hopkins contends that because the Port decided to expand the parking area to include the North “stack” area, where Hopkins had already placed the berm material, Hopkins had to remove some of the material to achieve the final grade for the asphalt. Hopkins further contends that after it had stockpiled the berm material, the Port directed Hopkins to place the material in the pot lines, which, according to Hopkins, was beyond the scope of the work called for in the contract.
The Port refutes Hopkins’s contention that the moving of the berm material was necessitated by a design change. The Port presented evidence showing that because Hopkins had failed to properly grade the berm material it had placed | isoriginally, the level was too high, and therefore Hopkins was directed to move the excess berm material from the stack area in an attempt to bring the area to grade. Additionally, the Port’s witnesses testified that after the Project was abandoned, the contractor the Port hired to complete the Project discovered that Hopkins had removed too much berm material, leaving the area below grade and necessitating that it be filled in.
Weighing the evidence, the trial court found that the necessity of moving the berm material twice was caused by Hopkins’s failure to properly grade the berm material the first time, and therefore, the Port should not have to reimburse Hopkins for the extra work. Based on the record, this finding is not manifestly erroneous. We therefore decline to disturb the trial court’s ruling.

B. Demolition of underground tunnel tops

The trial court denied Hopkins’s claim seeking additional payment in the amount of $105,825.16 for the demolition of certain underground tunnel tops. Hopkins contends that the contract drawings showed the tunnel tops to be near ground level and intersecting the potline walls, in which case Hopkins could have easily filled the tunnels with sand (as required by the contract) without performing any concrete demolition. Hopkins further contends that once the work had begun, Hopkins discovered that the underground tunnels were irregular in depth and the tunnel tops were below the potline floor slab, thereby requiring Hopkins to break through the concrete tunnel tops in order to fill the tunnels with sand. Hopkins argues that the placement of these underground tunnels was a “latent physical [ ^condition ... encountered at the site” that differed materially from those “indicated in the contract” or “ordinarily encountered” or “generally recognized as inherent in the work” pursuant to Section 104.06 A of the Red Book.[5] According to this provision, upon written notice of such a condition, the Engineer is required to investigate and determine whether an adjustment in the contract price is warranted. Hopkins contends that the Port refused to pay additional compensation on a time and materials basis for the demolition of these underground tunnel tops despite having done so in the case of other underground obstructions encountered by Hopkins.
*886 The Port argues that this claim by Hopkins is one of the consequences of Hopkins’s own failure to properly investigate the site before submitting its bid on the Project. The record reflects that Hopkins’s own project supervisor, Jason Keller, testified that the tunnel top demolition was an element in the contract and that the contract required Hopkins to fill those tunnels with sand using whatever method it chose. Additionally, Mr. Keller testified that Hopkins had requested and obtained permission to leave the broken-up concrete in the tunnels rather than having to remove it. Finally, Mr. Keller acknowledged that Change Order No. 3, which amended the contract, allocated an additional $25,000.00 to Hopkins to cover all past, present and future time and materials claims, which would include the tunnel top demolition.
| gpThe trial court denied this claim on the basis that it, along with all other time and materials claims, was settled by Change Order No. 3. The record supports the trial court’s finding. We therefore decline to disturb this ruling.

C. Grading of a larger surface area

The trial court denied Hopkins’s claim seeking additional compensation in the amount of $64,328.67 for having to spread base course over a larger surface area than contemplated in its bid. Hopkins contends that because the Port reduced the thickness of the base course from twelve inches to nine inches over most of the Project, Hopkins was required to spread, grade and finish a larger surface area. Hopkins further contends that the Port wrongfully refused to agree to a price adjustment for this “clearly significant” change.
As the Port points out, the contract price was based upon the amount of base course used, not the surface area. The Port argues that Hopkins’s compensation did not change because the parties agreed to reduce the thickness of the base course layer from twelve inches to nine inches, but to spread the same amount of base course over a larger surface area. There was never an agreement to change the method of pricing. Hopkins was paid by the cubic yard for the amount of base course used, which complied with the contract.
In denying this claim, the trial court found that if the twelve-inch depth had been used as originally planned, it would have required Hopkins to place the base course material twice: one shallow layer laid and compacted with a second layer laid and compacted over the first. The record supports the trial court’s conclusion. | ⅞1We find no manifest error in the trial court’s denial of this claim, and therefore decline to reverse that ruling.

D. Installation of additional fill material

Hopkins argues on appeal that the trial court should have awarded it an additional $73,492.79 for the placing of extra fill material in the North stack area. Hopkins contends that because the finished grade elevation of this area was changed from twelve inches to nine inches, Hopkins was required to install more fill than originally contemplated. Jason Keller testified that Hopkins chose to use base course instead of sand for additional fill material in the pot line area because Hopkins was having a problem grading the sand. As a result, Hopkins wound up using more base course, but less sand, than planned for the entire Project. Because the contractual unit price for sand was lower than that for base course, Hopkins sought compensation for the additional base course used at the sand rate. Mr. Keller testified that Hopkins had hired Alpha Testing to perform a *887 survey upon which the calculations necessary to determine the amount of compensation due had been based.
Hopkins’s claim was rejected by the trial court but not addressed in the Reasons for Judgment. Arguing that the trial court did not err by rejecting this claim, the Port emphasizes Mr. Keller’s admissions that Hopkins had chosen to substitute base course for sand without the permission of the Engineer or the Port, and that there was no contractual provision for the payment of base course when used in lieu of sand. The Port also points out that the Engineer had rejected UgHopkins’s calculation (the “Wink calculation”) and had refused to use it as a basis for payment.
Viewing the record as a whole, we do not find sufficient evidence to demonstrate that the trial court’s failure to award Hopkins the compensation sought in this instance was clearly wrong or manifestly erroneous. Accordingly, we decline to disturb the trial court’s ruling.

E. Concrete demolition and concrete box construction

The trial court denied Hopkins’s claims seeking $12, 444.75 for the demolition of a large tank foundation and several large footings encountered in the North stack area after the grade elevation was changed, and $8,225.02 for the construction of a concrete box around three existing pipes, which had been broken by a third party. In refuting this claim, the Port relies upon the testimony of Jerry Graves that these items would have been paid on a time and materials basis, and therefore were covered by Change Order No. 3, which settled all such claims by a $25,000.00 payment to Hopkins. The trial court found that all claims for additional demolition and/or removal of underground obstructions in the North stack area were “settled in the agreement by the Port ... contained in change Order # 3.” The record does not show this conclusion to be manifestly erroneous. We therefore decline to disturb the trial court’s ruling.
III. Whether Hopkins is entitled to the unpaid balance of the contract
The trial court awarded Hopkins the unpaid balance of the contract, which the parties agreed was $459,081.86, subject to deductions for the damages due to l^the Port for Hopkins’s unfinished and/or improperly performed work. The Port argues that this award is manifestly erroneous because Hopkins’s breach of the contract, causing damages to the Port, precludes a finding that “substantial completion” was achieved. The Port further contends that substantial completion would be necessary for the trial court to grant Hopkins the unpaid balance of the contract. In support of this contention, the Port cites Pete’s Plumbing and Heating, Inc. v. Geissert, 413 So.2d 554 (La.App. 4th Cir.1982), for the proposition that, where there has not been substantial completion, the contractor bears the burden of proving that it is entitled to any compensation. The Port thus contends that Hopkins failed to prove its entitlement to the unpaid balance.
The Port’s reliance upon Pete’s Plumbing and Heating v. Geissert is misplaced. Whether there was substantial completion is not at issue in the instant case. On the issue of Hopkins’s entitlement to the unpaid balance of the contract, both Hopkins and the Port rely upon the same contractual provision, Section 15.2.9, which reads, in pertinent part:
OWNER may, after giving CONTRACTOR seven days’ written notice ... terminate the services of CONTRACTOR, exclude CONTRACTOR from the site and take possession of the Work ... and finish the Work as OWN *888 ER may deem expedient. In such case, CONTRACTOR shall not be entitled to receive any further payment until the Work is finished. If the unpaid balance of the contract price exceeds the direct, indirect and consequential costs of completing the Work ... such excess will be paid to CONTRACTOR. If such costs exceed such unpaid balance, CONTRACTOR shall pay the difference to OWNER.
Significantly, the above-cited provision does not mention substantial completion. Moreover, a plain reading of this provision refutes the Port’s argument. The stipulation that the Contractor is not “entitled to receive any further payment until l^the Work is finished” obviously contemplates the Work having been finished by the Oumer (or by whomever he has hired to finish it), rather than by the Contractor. In fact, by awarding Hopkins the unpaid balance of the contract after deducting the damages caused by Hopkins to the Port, the trial court complied exactly with the above-quoted contractual provision. We therefore reject this assignment of error by the Port.
IV. Whether the Port is entitled to additional liquidated damages
Prior to trial, the Port had withheld from Hopkins 42 days of liquidated damages at $500.00 per day, which equals $21,000.00. At trial, the Port sought 91 additional days of liquidated damages at $500.00 per day, or $46,000.00. The trial court awarded the Port the additional $46,000.00. Therefore, the total amount of liquidated damages covered 133 days, the time between the Project’s extended completion date of September 14, 2001, through the Port’s termination of Hopkins in February, 2002. Hopkins contends that the amount awarded by the trial court was clearly wrong considering that Hopkins worked for approximately sixteen months on a project that was originally scheduled to be completed in 150 days, an indication that the scope of the Project turned out to be substantially different from what was initially contemplated by the parties.
The Port emphasizes that Hopkins’s argument ignores the effect of Change Orders Nos. 1, 2, and 3, which extended the total contract time to 405 days. In addition, the Port points out that under the contract, the Port could have assessed liquidated damages of $2000.00 per day after the first 7 days, which the Port did not seek to do.
With regard to liquidated damages, the contract in Section 00850, SP (Special Provision)^, provides, in pertinent part:
| ^LIQUIDATED DAMAGES. Time is an essential condition of the contract. Should the Contractor fail or refuse to perform the work within the contract time stipulated herein, the Contractor agrees to pay to the Owner ... the sum of $500.00 per day for each calendar day for the first seven (7) calendar days and $2,000.00 per day for each calendar day thereafter beyond the completion time specified unless the contract time is extended by the Owner. The Owner shall retain the amount of such damages from any money due or to become due the Contractor under this contract without the necessity of the Owner putting the Contractor or his Surety either or both in default.
In its Reasons for Judgment, the trial court stated that the Port’s claim for liquidated damages was justified based upon its findings that: “Hopkins did not only underbid the project, but did not do adequate investigation of the amount and nature of the work to be performed under the contract before it submitted its bid. Further, delays caused by machinery (concrete crusher) failure, supervisory prob *889 lems, manpower problems, and improper performance caused delays to the project that cannot be attributed to the Port.” Based upon the record, we find no manifest error in the trial court’s conclusion. We therefore decline to disturb the award of liquidated damages.
V. Whether the Port is entitled to attorney’s fees
The trial court declined to grant the Port’s claim seeking $147,503.00 in attorney’s fees. In its Reasons for Judgment, the trial court indicated that the language of the contract providing for indemnification and attorney’s fees applied only to third-party actions brought against the Owner or Engineer for loss or damage attributable to the contractor’s negligence, not to actions between the parties to the contract. Section 6.30 of the contract provides, in pertinent part:
CONTRACTOR shall indemnify and hold harmless OWNER and ENGINEER ... from and against all claims, damages, losses and 12f,expenses ... (including but not limited to fees and charges of ... attorneys ...) arising out of or resulting from the performance of the Work, provided that any such claim, damage, loss or expense (a) is attributable to bodily injury, sickness, disease or death, or to injury or destruction of tangible property (other than the Work itself) ... and (b) is caused in whole or in part by any negligent act of omission of CONTRACTOR....
Citing Cox Communications v. Tommy Bowman Roofing, LLC, 2004-1666 (La.App. 4 Cir. 3/15/06), 929 So.2d 161, the Port argues that the trial court erred in interpreting this provision. In Cox, this court held that an indemnity provision in a roofing contract was not limited to third party claims, but could also apply to claims for negligent performance brought by one contracting party against the other.
However, the Cox case is not dis-positive of the issue presented here, which is not indemnity for negligent performance, but rather the Port’s entitlement to attorney’s fees. Unlike the instant case, Cox did not involve reciprocal claims by each contracting party alleging that the other had not fulfilled its obligations under the contract. In the instant case, both Hopkins and the Port prevailed on some of their claims. Moreover, the contract between them strictly limits indemnity claims to those arising out of negligent acts or omissions, whereas the claims involved in this suit are for breach of contract. The Port’s reliance upon Cox is therefore misplaced.
As this court has held, whether to award attorney’s fees in a particular case is left to the sound discretion of the trial court. Dixie Services, L.L.C. v. R&B Falcon Drilling USA Inc., 2005-1212, 2006-1209 (La.App. 4 Cir. 3/21/07), 955 So.2d 214, 220. We find no abuse of discretion in the trial |j>7court’s decision to deny the Port attorney’s fees in this instance, and therefore decline to disturb the trial court’s ruling in this respect.
CONCLUSION
For the reasons stated, the judgment of the trial court is affirmed.
AFFIRMED

. The parties agreed that the Project was to be governed by the Louisiana Standard Specifications for Roads and Bridges, 2000 ed., State of Louisiana, Department of Transportation and Development (also known as "the Red Book”).

. The parties agreed that the unpaid balance on the contract was $459,081.86.

. Hopkins obtained an order appealing both the September 1st judgment and the September 6th amended judgment, but does not assert any assignments of error related to the September 1 st j udgment.

. In its Reasons for Judgment the trial court states: "Piles of sand were left on the site by Hopkins when it abandoned the Project.”

. See footnote 1, supra.