ROSEMARY LEDET, Judge.
1 ]This is an eviction proceeding. Armstrong Airport Concessions, A Joint Venture (“Concessionaire”), seeks review of the trial court’s judgment denying, in part, the rule for eviction it filed against K-Squared Restaurants, LLC (“K-Squared Popeyes”); K-Squared Restaurants (Subway), LLC (“K-Squared Subway”); Kirksey Enterprises, Inc. (“KEI”); and Karlton Kirksey (collectively the “Defendants”). For the reasons that follow, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
On July 8, 1999, the New Orleans Aviation Board (the “Board”) and Concessionaire entered into a Master Lease.[1] The Master Lease named Concessionaire as the master concessionaire at the New Orleans International Airport Terminal (the “Terminal”) and granted it the right to sublease spaces within the Terminal’s designated food and beverage areas. The Master Lease required that Concessionaire operate all restaurant locations in the Terminal for a minimum of twelve hours a day, seven days per week.
|aOn May 1, 2004, Concessionaire entered into a Sublease Agreement with KEI and Mr. Kirksey, individually as owner and guarantor. Under the Sublease, KEI was granted the right to operate two food and beverage • locations in the Terminal. The Subleased Facility is described in Section 3 of the Sublease, which provides as follows:
3.1 Description
(a) Concessionaire does hereby grant Operator the right to occupy and use the Subleased Facility (being 1,150 square feet) described in Exhibit A1 in space number ETLF-1, in the East Lobby Food Court at the Airport, with a limit *1097 ed menu upon the terms and conditions herein set forth, with possession to commence on “Subtenant DBO” (as hereinafter defined)[2] for the sole purpose of operating a Popeyes Chicken and Biscuits concession stand. The authorized menu items and the prices therefor are set forth in Exhibit B1 (the “Authorized Products”). Operator agrees to operate its business in the Subleased Facility in accordance with the terms and conditions set forth herein [the “Popeyes Location”].
(b) Concessionaire does hereby grant Operator the right to occupy and use the Subleased Facility (being 312 square feet) described in Exhibit A2 in space number EBF-4C, in the Mini Food Court, Concourse B at the Airport, with' a limited menu upon the terms and conditions herein set forth, with possession to commence on “Subtenant DBO” (as hereinafter defined) for the sole purpose of operating a Subway concession stand. The authorized menu items and the prices therefor are- set forth in Exhibit B2 (the “Authorized Products”). Operator agrees to operate its business in the Subleased Facility in accordance with the terms and conditions set forth herein [the “Subway Location”].
Exhibits attached to, and incorporated into, the Sublease show the exact location of each Subleased Facility — the Popeyes Location and the Subway Location. The Sublease defines the rent due to Concessionaire based on a formula that includes two components: the Minimum Annual Guarantee and the Percentage Payment. isThe Minimum Annual Guarantee is apportioned between the two locations based on the square footage of each location. The Percentage Payment is apportioned between the two locations based on the Gross Concession Revenues derived from the sale of Authorized Products at each location.
The Sublease, similar to the Master Lease, includes a requirement that the Subleased Facility be open a minimum of twelve hours a day, seven days per week. Specifically, the requirement is set forth in Section 7.5, which provides; in part, as follows:
Hours of Operation. Operator shall ensure that its Subleased Facility is open at the minimum twelve (12) consecutive hours each day, seven (7) days each ' week, including holidays unless otherwise specifically permitted by written consent of Concessionaire and Board from time to time and subject to the request of being open consistent with the depárture of all flights including delayed flights in the Terminal.
The Sublease defines the. Events of Default as including “Operator abandons or ceases to.use the Subleased Facility for three (3) day at any one.time.” Sublease, Section 15.1(d). Under the Sublease, the remedies for any event of default include “[t]erminate this Agreement without discharging any of the Operator’s obligations hereunder and exclude Operator from the Subleased Facility.” Sublease, , Section 15.2. The Sublease also provides for liquidated damages in the event of default.
As to assignment, the Sublease provides:
17.1 Operator acknowledges that this Agreement is personal in nature on the part of the Operatór and, it does not have the right or power under this *1098 Agreement to: assign, sublet or in any manner transfer this Agreement or any estate or interest hereunder, except with the prior written consent of Concessionaire and the Board, in their sole discretion.
17.2 No such assignment will be approved unless the assignee is: (a) financially and operationally qualified to operate the business; (b) a duly qualified DBE [Disadvantaged Business Entity]; and (c) |4pre-approved as a successor operator hereunder by the Board and New Orleans City Council.
.The Sublease includes a governing law provision, which provides “[t]his Agreement shall be governed and construed pursuant to the laws of the State of Louisiana.” Sublease, Section 28.8. On June 28, 2004, the Board approved the Sublease.
On August 1, 2006, Concessionaire, KEI, K-Squared Popeyes, and K-Squared Subway entered into a Bifurcation, Assignment and Assumption Agreement (the “Assignment Agreement”). In the Assignment Agreement, KEI, with Concessionaire’s approval, assigned its rights and obligations under the Sublease to K-Squared Popeyes for the Popeyes Location, and to K-Squared Subway for the Subway Location; the pertinent provisions of the’ Assignment Agreement provide as follows:
Section 2: ASSUMPTION OF OBLIGATION BY ASSIGNEE AND BIFURCATION OF RESPONSIBILITIES
2.1 Assignees [K-Squared Popeyes and K-Squared Subway] hereby assume and agree, jointly and severally to folly • perform all of the obligations of the Assignor [KEI] arising under the Sublease Agreement as well as the obligations of the Assignor pursuant to the closing documents entered into by the Assignor with Whitney National Bank including, but not limited to, the Loan Agreement, Promissory Note and Security. Agreement (such obligations shall hereinafter be collectively referred to as the “Obligations.”)
2.2 As between the Assignees, KSR [K-Squared Popeyes] covenants to pay all expenses (including, but not limited to, all rents and fees) attributable to the occupancy and use of the Popeyes Location and KSR-Subway [K-Squared Subway] covenants to pay all expenses (including, but not limited to, all rents and fees) attributable to the occupancy and use of the Subway Location. However, the foregoing shall not relieve either KSR [K-Squaréd Popeyes] or KSR-Subway [K-Squared Subway] from their joint and several responsibility to Concessionaire. Default by either party shall be a Default under the Sublease.
| .-¡The Assignment Agreement further provides that “[t]he Assignor [KEI] and Assignees [K-rSquared* Popeyes and K-Squared Subway] agree that they shall be jointly and severally liable for the performance of the Obligations under the Sublease.” Assignment Agreement, Section 4.
On December 3, 2009, a First Amendment to the Sublease Agreement was perfected. ' In this agreement, the term “Operator” is collectively defined as K-Squared Popeyes and K-Squaréd Subway.
On November 30, 2013, K-Squared Po-peyes closed the Popeyes restaurant it was operating at the Popeyes Location in the Terminal; since that date, ■ the Popeyes restaurant has remained closed. On both December 5, 2013 and May 29, 2014, Concessionaire issued a notice of default to the Defendants. ■ In the notices of- default, Concessionaire averred that the Defendants’ cessation of use of the Subleased Facility — the Popeyes Location — for three days at one time constituted a breach of the Sublease Agreement and an .event of default. See Sublease, Sections -7.5 and *1099 15.1(d), quoted above. Concessionaire thus demanded the breach and the default be cured. Absent a cure, Concessionaire expressed its intent to terminate the Sublease and to take possession of the entire Subleased Facility — the Subway Location and the Popeyes Location.
On December 6, 2013, Concessionaire filed a Petition for Eviction and Damages for Breach of Lease against the Defendants. This initial petition, however, was dismissed on the Defendants’ exception of prematurity. Concessionaire did not seek appellate review of this dismissal. Instead, on June 24, 2014, Concessionaire filed a second Petition for Eviction and Damages for Breach of Lease against the Defendants.
I (¡Following a hearing held on January 23, 2015, the trial court granted the eviction as to the Popeyes Location, terminating the Sublease for that location and ordering that KEI vacate that location. ■ The trial court, however, denied Concessionaire’s eviction-as to the Subway Location. The trial court thus rendered the following judgment:
a) The Rule for Eviction is granted as to that property designated as ETLF1 in the East Food Court of the New Orleans Airport (the “Po-peyes Location”), the Sublease Agreement, as amended, is hereby terminated as to the Popeyes Location, and the Defendants are ordered to relinquish possession- of the Po-peyes Location to Concessionaire within 24 hours of the execution of this Judgment; and
b) The Rule for Eviction is denied in all other respects, including as to that property designated as EBF11 located in the Mini-Food Court in Concourse B (the “Subway Location”).
This appeal followed.
Concessionaire simultaneously filed a writ application seeking supervisory review from' the same judgment. On May 21,2015, this court denied Concessionaire’s writ. Armstrong Airport Concessions, A Joint Venture v. K-Squared Restaurants, LLC, 15-0267 (La.App. 4 Cir. 5/21/15) (unpub.).
DISCUSSION
Before reaching .the merits of Concessionaire’s appeal, we first address the Defendants’ contention that the law of the case doctrine precludes our revisiting the issues raised on this appeal.

Laiv of the case doctrine

Defendants contend that our prior decision denying Concessionaire’s writ application seeking review of the same judgment should be considered law of the Lease.[3] Concessionaire counters that-the *1100 law of the ease doctrine does not apply because this court simply denied its writ application, albeit with reasons. It also explains that it simultaneously filed both a writ and an appeal because it was uncertain of the appropriate procedural mechanism to seek review of a judgment denying in part and granting in part an eviction petition. ,. ■
The law of the case doctrine refers to the following:
“(a) the binding force of trial court rulings during later stages of the trial,
(b) the conclusive effects of appellate court rulings at the trial on remand, and
(c) the rule that an appellate court will ordinarily not reconsider its own rulings of law on a subsequent appeal in the same case.”
Brown v. Serpas, 13-1679, p. 4 (La.App. 4 Cir. 7/16/14), 146 So.3d 748, 752 (quoting Petition of Sewerage and Water Bd. of New Orleans, 278 So.2d 81, 83 (La.1973)). Applying the “law of the case” doctrine to supervisory writs decisions is discretionary. Lake Air Capital II, LLC v. Perera, 15-0037, pp. 7-8 (La.App. 4 Cir. 5/13/15), 172 So.3d 84, 88. Thus, any prior ‘determination’ in a request for a supervisory writ is not necessarily binding on a subsequent appeal.” 15-0037 at p. 8, 172 So.3d at 88. Moreover, it is well-settled that “the' denial of a writ has no precedential value.” Id. (collecting cases). Hence, “[generally, the denial of supervisory writs does not bar a different conclusion or reconsideration of the same issue argued in the writ application when an appeal is taken from a final judgment.” Id.
 Both this court and the Louisiana Supreme Court have addressed, and rejected, the same argument the Defendants raise regarding the application of the law of the case doctrine when a prior writ application has been denied. See Rain CII Carbon LLC v. ConocoPhillips Co., 12-0203, pp. 4-6 (La.App. 4 Cir. 10/24/12), 105 So.3d 757, 760-61; Davis v. Jazz Casino Co., L.L.C., 03-0276, p. 1 (La.6/6/03), 849 So.2d 497, 498; Bulot v. Intracoastal Tubular Services, Inc., 02-1035. (La.6/14/02), 817 So.2d 1149; see also Johnson v. Mike Anderson’s Seafood, Inc., 13-0379, pp. 5-6 (La.App. 4 Cir. 6/11/14), 144 So.3d 125, 130-31, writ denied, 14-1459 (La.10/10/14), 151 So.3d 586. As this court has noted, “[t]he denial of a writ by an appellate court is nothing more than the appellate court declining to exercise its supervisory jurisdiction. An appellate court cannot affirm, modify or reverse a decision by a lower court without granting an application for supervisory review.” Mike Anderson’s Seafood, 13-0379 at p. 6, 144 So.3d at 131. As the Supreme Court has held, “any language in the court of appeal’s earlier writ denial purporting to find no error in the trial court’s certification ruling is without effect.” Davis, 03-0276 at p. 1, 849 So.2d at 498.
| ^Applying these principles, we decline to apply the law of the casé doctrine in the instant case. We thus turn to the merits of this appeal.

Standard of review and applicable legal principles

Generally, a trial court’s judgment in aft eviction case is reviewed under the manifest error standard of review. See Sizeler Real Estate Management Co., Inc. v. Family Dollar Stores of Louisiana, Inc., 01-1974, p. 4 (La.App. 4 Cir. 3/20/02), 814 So.2d 611, 614. Stated otherwise, “factual findings of the lower court [in an eviction matter are reviewed] under the manifest error standard of review.” Keyes *1101 v. Brown, 14-0821, p. 6 (La.App. 4 Cir. 1/28/15), 158 So.3d 927, 931 (quoting Mazzini v. Strathman, 13-0555, p. 4 (La.App. 4 Cir. 4/16/14), 140 So.3d 253, 256).
The instant appeal,' however, primarily presents a legal question of contractual interpretation, which is' subject to de novo review on appeal. See Subervielle v. State Farm Mut. Auto. Ins. Co., 08-0491, p. 2 (La.App. 4 Cir. 1/7/09), 32 So.3d 811, 812 (citing French Quarter Realty v. Gambel, 05-0933, p. 3 (La.App. 4 Cir. 12/28/05), 921 So.2d 1025, 1027); Keyes, 14-0821 at pp. 6-7, 158 So.3d at 931 (holding that “[t]he proper interpretation of a contract is a question of law subject to de novo review”); see also Premier Restaurants, Inc. v. Kenner Plaza Shopping Ctr., L.L.C., 02-296, p. 6 (La.App. 5 Cir. 11/26/02), 833 So.2d 446, 450 (holding that “when appellate review is not. premised upon any factual findings madé at the trial level, but is, instead, based upon an inde: pendent review and examination of the contract oh its face, the manifest error rule does not apply”); see also Smith v. Coffman, 46,793, p. 10 (La.App. 2 Cir. 2/8/12), 87 So.3d 137, 144-45 (same). Moreover, when, as in this case, “ ‘there is no dispute as to the dispositive facts, the issue can be decided as a matter of law and the review | mis de novo.”’ Tymeless Flooring; Inc. v. Rotolo Consultants, Inc., 14-1392, pp. 4-5 (La.App. 4 Cir. 5/20/15), 172 So.3d 145, 148 (citing Demma v. Automobile Club Inter-Insurance Exch., 08-2810, p. 7, n. 4 (La.6/26/09), 15 So.3d 95, 100) (citing Kevin Associates, L.L.C. v. Crawford, 03-0211, p. 15 (La.1/30/04), 866 So.2d 34, 43).
The Civil Code provides instructions as to the proper method of contract interpretation. Landis Const. Co., L.L.C. v. St. Bernard Parish, 14-0096, pp. 5-6 (La.App. 4 Cir. 10/22/14), 151 So.3d 959, 962-63, writ denied, 14-2451 (La.2/13/15), 159 So.3d 467. The pertinent instructions are as follows:
• A contract constitutes the law between the parties. La. C.C. art. 1983. Interpretation of a contract is the determination of the common intent of the parties.” ■ La. C.C. art. 2045.
• “When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent.” La. C.C. art. 2046. In such a case, the meaning and intent of the parties to a written contract must be determined as a matter of law from the four corners : of the instrument without resorting to extrinsic evidence.[4]
• When the meaning of a contractual provision is doubtful, the provision must be interpreted in light of considerations such as “the nature of the contract, equity, usage, and the conduct of the parties before and after the formation, of the contract.”. La. C.C. art. 2053.
• “In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text.” La. C.C. art. 2056.
In this case, the trial court, at the conclusion of the eviction hearing, orally expressed two reasons for its decision granting the eviction as to the Popeyes Location, but denying it as .to the Subway Location. First, the trial court found the *1102 I n obligations under the contractual agreements between the parties — the Subcontract and the Assignment Agreement— were divisible. Second, the trial court found that the contractual agreements were unclear as to whether a default by either of the restaurant locations — the Po-peyes Location or the Subway Location— was a default by both of them. Because the terms of the contractual agreements were unclear, the trial court further found the general rule of contractual construction that the agreements must be construed against the drafter — Concessionaire — applied.
Although Concessionaire asserts five assignments of error on appeal, the issues presented by this appeal are two-fold: (i) whether the .trial court erred in finding the obligations under the Sublease were divisible; and (ii) whether it erred.in finding the contractual agreements at issue — the Sublease and the Assignment Agreement— were ambiguous. Although these two issues are intertwined, we separately address each issue.

Divisible obligations

The Louisiana Civil Code differentiates between divisible and indivisible obligations as follows:
An obligation is divisible when the •object of the performance is susceptible of division. > ■
An obligation'is indivisible when the object of the performance, because of its . nature or because of the intent of the parties, is not susceptible of .division.
La. C.C. art. 1815. “Indivisible obligations cannot be partially executed nor, a priori, can they be partially rescinded." Musser v. Copping, 325 So.2d 681, 684 (La.App. 4th Cir.1975).
hgThe common law, in contrast, distinguishes between divisible and entire contracts. The common law term “divisible contract” has been equated with a “severa-ble contract,” and a “severable contract” is defined as follows:
A contract that includes two or more promises each of which can be enforced separately,, so that failure to perform one of the promises.does not necessarily put the promisor in breach of the entire contract.
Bryan A. Garner, BLACK’S LAW DICTIONARY 348 (8th ed. 2004).
Louisiana courts have confused the' civil law concepts “divisible and indivisible obligations” with the common law concepts “entire and severable contracts.” See La. C.C. art. 1815, Revision Comment (c) (citing Audubon Bldg. Co. v. F.M. Andrews & Co., 187 F. 254, 258 (5th Cir.1911), which held that “[a]s the contract, which is the basis of the demands made in this' suit, provides for separate items and the price is. apportioned to each item, it is'severa-ble”); ’ see also Stockstill v. Byrd, 132 La. 404, 410, 61 So. 446, 448 (1913) (holding that “the general principle to be clear that covenants are to be considered divisible or indivisible, dependent or independent, separable or entire, according to the intention of the parties, which is to be deduced from the whole instrument”).
Despite the confusion regarding these concepts, a-commentator points out that “a civil, law court will inquire into the divisibility'or indivisibility of an obligation and a common-law court will inquire into the divisibility : or entirety of a contract ... whenever it is. necessary to ■ determine whether, a contract can be- .dissolved in part.” Ronald J. Scalise,.Jr., 5 LA. CIV. L. TREATISE, LAW OF OBLIGATIONS, § 9.41 (2d ed.). ■
As with other contract interpretation issues, the question whether a contract is severable or divisible is generally guided by. the intent of the parties as *1103 expressed by the contract terms. See Hudson v. City of Bossier City, 05-0351, p. 20 (La.4/17/06), 930 So.2d 881, 894; see also Lebouef v. Liner, 396 So.2d 376, 378 (La.App. 1 Cir.1981); Barber v. Barber, 09-0780, pp. 5-6 (La.App. 1 Cir., 5/7/10), 38 So.3d 1046, 1050. Stated otherwise, “[a] court’s determination as to whether a contract is several or joint should be guided by ‘the rules for the interpretation of contracts.’ ” City of Alexandria v. Brown, 740 F.3d 339, 355 (5th Cir.2014) (citing Shell Petroleum Corp. v. Calcasieu Real Estate & Oil Co., 185 La. 751, 763, 170 So. 785, 789 (1936)).
Concessionaire contends that the trial court erred in finding the obligations in the Sublease divisible. .It points out that the parties entered into a single lease — the Sublease — for two separate locations. It contends that the Sublease contains indivisible obligations on the part of KEI to operate both the Popeyes Location and the Subway Location. According to Concessionaire, the Assignment Agreement neither divides nor allocates any of the lease obligations between K-Squared Popeyes and K-Squared Subway. Concessionaire contends that the parties went to great lengths to avoid the Assignment Agreement creating two separate leases, the performance of which are totally and completely separate. ' To do so, the parties provided in the Assignment Agreemént for the assignees — K-Squared Popeyes and K-Squared Subway — to collectively assume KEI’s indivisible obligations under the Sublease. Moreover, the parties used the phrase “joint and several” — which is synonymous with “in solido” or “solidary liability”[5] — multiple times in the Assignment Agreement to avoid that result. The sole mention in the Assignment Agreement of a division of obligations is the provision stating the division of [ obligation is only “as between the Assignees.” In sum, Concessionaire argues that the parties entered a single lease— the Sublease — and that the trial court’s finding, the obligations were divisible essentially misinterprets the Assignment Agreement as splitting the Sublease into two leases.
Defendants counter that the performance KEI owed Concessionaire under the Sublease Agreement included divisible obligations and that the Assignment Agreement simply transferred those divisible obligations to K-Squared Popeyes and K-Squared Subway. ' According to Defendants, Sections 3.1(a) and (b) of the Sublease indicate that'the two spaces to which the restaurants were assigned were each intended for use solely by a single, specific business entity, and terms of the Sublease regarding the nature and uses of the property demonstrate’ a common understanding that the restaurants were to be considered separate and distinct entities. Defendants also contend 'that the agreement to use and operate the Popeyes’ Location should properly be considered a separate and independent covenant' and agreement and that any consequences arising from the failüre of that entity to remain open have no bearing upon the operations of the Subway Location.[6]
*1104 Defendants emphasize that the Sublease permits it to assign, sublet, or transfer the Sublease or any estate or interest thereunder provided the assignee be financially and operationally qualified to operate the business, that it be a duly qualified DBE, and that it be pre-approved as a successor operator by the Board and by the New Orleans City Council. Defendants also: emphasize that Section 1 of 11Bthe Assignment Agreement states that KEI divided the object of its performance owed under the Sublease, separately assigning all of its rights in accordance with Section 3.1(a) to occupy the Popeyes Location to K-Squared Popeyes, and its rights to occupy the Subway Location, through Section 3.1(b) to K-Squared Subway.
The object of performance in the Subcontract — the use and .occupancy of two separate locations in the Terminal — is susceptible of division. See Bd. of Levee Comm’rs of Orleans Levee Dist. v. Magee Aircraft Co., 77 So.2d 239, 244 (La.App. Orl.1955) (rejecting argument that a lease of two hangars at the airport, which properties were located some distance apart from each other, was indivisible). Although La. C.C. art. 1815 provides that an object can also be indivisible based on the parties’ intent, the Subcontract contains no language establishing the parties’ intent that the obligations in the Sublease be indivisible. To the contrary, various provisions in the Sublease support a finding that the parties intended the obligations to be divisible.
First, Section 3.1(a) and (b) of the Sublease define the “Subleased Facility” as two separate locations — the Popeyes Location, “being 1,150 square feet” described in Exhibit Al; and the Subway Location, “being "312 square feet” described in Exhibit A2. At each location, KEI was required to sell only the defined “Authorized Products.” Consistent with these provisions of the Sublease, the second WHEREAS clause on the first page of the Sublease simply states:'
WHEREAS, Operator [KEI] desmes to obtain a right to use a portion of the Terminal (the “Subleased Facility” shown on Exhibit Al and A2) leased to Concessionaire under such Concession Agreement [the Master Lease] to use same for the sale of the Authorized Products ' (as hereafter defined) described on Exhibit B1 and Exhibit B2.
| ^Likewise, the formula in the Sublease for calculation of the rent, as explained elsewhere, is based on an apportionment of the square footage of each location and the revenues from the sale of Authorized Products at each location.
Another pertinent part of the Sublease evidencing the parties’ intent that the obligations are divisible, as Defendants point out, is the assignment provision. The Sublease authorizes KEI, albeit with the consent of the Board and the New Orleans City Counsel, to assign any interest in the Sublease. As provided for in the Sublease, KEI obtained the necessary consent and assigned its rights under the Sublease to K-Squared Popeyes and K-Sqüared Subway.
The first section of the Assignment Agreement states that KEI, with Concessionaire’s approval, assigned its rights and obligations under the Sublease to K-Squared Popeyes for the Popeyes Location, and to K-Squared Subway for the Subway Location. In the Assignment Agreement, the common law phrase “joint and several” is used multiple times. Even assuming, as Concessionaire contends, that the parties intended the phrase “joint and several” to mean “in solido” or solidary liability, the use of that- phrase in the Assignment Agreement did not transform the divisible obligations set forth in the Sublease into indivisible obligations. See *1105 La. C.C. art. 1820 (providing that “[a] stipulation of solidarity does not make an obligation indivisible”). At best, the inclusion of that phrase in the Assignment Agreement created an ambiguity, which we discuss.next.

Ambiguous

“A contract is considered ambiguous on the issue of intent when it lacks a provision bearing on that issue, the terms of the written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed.” ] Campbell v. Melton, 01-2578, p. 6 (La.5/14/02), 817 So.2d 69, 75. The determination of whether a contract is clear or ambiguous is a question of law. Keyes v. Brown, 14-0821, pp. 6-7 (La.App. 4 Cir. 1/28/15), 158 So.3d 927, 931.
As noted, the trial court found the contractual' agreements' ambiguous. In its oral reasons for judgment, the trial court explained its reasoning as follows:
I do not find that they [the Sublease and the Assignment' Agreement] clearly say that — even though they say the obligations are joint, I think that the obligations are divisible. It’s not clear. And if the Airport wanted to — their [sic] seeking to establish that any default by either of Mr. Kirksey’s restaurants is a default by all of them. They could have said it. I don’t believe that the words— I’m very aware of the words in the contract that you are relying on, and I don’t believe that they make that clear.
Concessionaire contends that the Assignment Agreement contains the language the trial court found was lacking. In support, it cites the provision that “[default by either party [K-Squared Popeyes or K-Squared Subway] shall be a Default under the Sublease.” Concessionaire contends that because the contractual agreements are not silent, the trial court erred in resorting to the default rules of contract construction under the ■ Louisiana Civil Code. Concessionaire contends that the trial court’s ruling ignores the clear terms of the Assignment Agreement and the Sublease. ■ Concessionaire argues that nowhere is there any authority for Defendants' to operate one space and not the other and not be in -default under the Sublease.
Concessionaire’s proffered interpretation of the language in the contractual agreements, as Defendants contend and the trial court found, creates an ambiguity. The provision that “[djefault by either party [K-Squared Popeyes or K-Squared Subway] shall be a Default under the Sublease,” as Defendants point out, can be read to mean that K-Sqúared Popeyes’ failure to use the Popeyes' Location for three 1 i«days constitutes a breach of KEI’s divisible right'under Section 3.1(a) of the Sublease to occupy and use the Popeyes Location separately assigned 'to K-Squared Popeyes. As noted above, Concessionaire’s reading of this provision is based on its theory that the Sublease was indivisible and that the Assignment Agreement continued that indivisible obligation by making the assignees solidary obligors. Again, the Sublease contains divisible obligations; 'and the Assignment Agreement did not transform those divisible obligations into indivisible obligations. See La. C.C. art. 1820. ' • ■
Although Concessionaire correctly contends that the contractual- agreements do not state that Defendants can operate one location and not the other without being in default, the converse is likewise true. The agreements, as the trial court correctly concluded, do not provide that the failure to operate one location is a default as to the other location. Because *1106 the agreements are silent .on this issue, the agreements are ambiguous.- Campbell-, supra. We find no error in the trial court’s resort to the principal that a contract that is ambiguous should be. construed against the drafter — in this case, Concessionaire. La. C.C. art. 2056; see Pollard v. Schiff, 13-1682, p. 10 (La.App. 4 Cir. 2/4/15), 161 So.3d 48, 55 (holding that, under Louisiana law, ambiguous clauses aro construed against the drafter).
Given our finding that the Sublease contained divisible obligations that were not transformed by the Assignment Agreement into indivisible obligations coupled with our finding' that the agreements are ambiguous, we find no error in the trial court’s holding denying the eviction in part as to the Subway Location.

Frivolous appeal damages

.In their appellee brief, Defendants include a request — labeled a “motion” — for frivolous appeal damages under La. G.O.F. art. 2164. Defendants, however, I milled neither an answer nor a cross-appeal to Concessionaire’s appeal. As a. result, we find Defendants’ request for frivolous appeal damages is not properly before us. See La. C.C.P. art. 2133; see also Johnson v. Nguyen, 00-1148, p. 10 (La.App. 4 Cir. 7/11/01), 793 So.2d 370, 376 (Murray, J., concurring) (noting that.“[a]s the appellees did- not answer this appeal nor file an appeal, the issue of their entitlement to additional sanctions and/or sanctions for frivolous appeal cannot be considered by this court.”); see Gail S. Stephenson, Sanctions for Frivolous Civil Appeals in Louisiana, 75 La. L. Rev. 1125, 1137 (2015) (noting that “the rule that damages for frivolous appeal must -be requested in an answer to appeal or cross-appeal has been established through 150 years of jurisprudence" and collecting cases.) Accordingly, Defendants’ requests for frivolous appeal damages is denied.

DECREE

For the foregoing reasons, the trial court’s judgment is affirmed.
AFFIRMED

. The Master Lease was originally entered into by CA One/Pampy’s and the Board. Under the Master Lease, Concessionaire is the successor of CA One/Pampy’s.

. In the definition seGtion of the Master Lease, “DBO” or "date of Beneficial Occupancy” is defined to mean “the date on which the Board certifies that the Premises, or portions thereof, are ready for the commencement of Lessee’s or Sublessee's concession activities after completion of applicable Infrastructure Improvements and Tenant Improvements and all applicable licenses have been issued.”

. We acknowledge, as Defendants contend, that Concessionaire’s writ application and appellant brief are remarkably similar, Indeed the same five assignments ■ of error are set forth in both, which are as,follows: ■
1. The trial court erred in denying, in part, the rale for eviction sought by Concessionaire as it pertains to the Subway Location.
2. The trial court erred in refusing to enforce the dear and unambiguous language of the relevant contractual documents, including the Sublease and the Assignment Agreement, which clearly states that a default as to either the Subway Location or the Popeyes Location constitutes a default .under, the Sublease as a whole, entitling. Concessionaire to terminate the Sublease in its entirety,
3.The trial court erred in effectively splitting the Sublease into two obligations when such result is contrary to the clear terms ancl conditions of the Sublease and the Assignment Agreement.
•4. The trial court erred in failing to enforce the Sublease'and the- Assignment Agreement according to their terms,
.5, The trial- court erred in. denying the rule .for eviction as it pertains to the Subway *1100 Location as a result’ of the Kirksey entities’ breach of the Sublease Agreement in unilaterally closing the Popeyes Location on or about November 30, 2013.

. St. Bernard Port, Harbor & Terminal Dist. v. Guy Hopkins Const. Co.; Inc., 12-0167, pp. 6-7 (La.App. 4 Cir. 1/16/13), 108 So.3d 874, 879-80, writ denied, 13-0705 (La.5/17/13), 118 So.3d 380 (citing Martin Exploration Co. v. Amoco Production Co., 93-0349 (La.App. 1 Cir. 5/20/94), 637 So.2d 1202, 1205).

. In Louisiana, the common law term "joint and several” is considered synonymous with the civil law term "in solido,” or "solidary liability.” Rodriguez v. Walters, 12-0959, p. 25, n. 28 (La.App. 4 Cir. 2/5/14), 136 So.3d 871, 890 (citing Johnson v. Jones-Journet, 320 So.2d 533, 536 (La.1975), and Touchard v. Williams, 617 So.2d 885 (La.1993)),

. Defendants also cite Section 28,6 of the Sublease Agreement, entitled "Independent Covenant” which states that “[e]aeh and every covenant and agreement contained in this Agreement is, and shall be construed to be, a separate and independent covenant and . agreement,”