| DAISY ELLIS, LINDSEY DUBOSE, AND SAMANTHA MAZA | * | NO. 2024-CA-0721 |
|---|---|---|
| | * | |
| | | COURT OF APPEAL |
| VERSUS | * | |
| | | FOURTH CIRCUIT |
| RICHARD M. IRELAND, JR | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
FIRST CITY COURT OF NEW ORLEANS
NO. 2022-01013, SECTION "B"
Honorable Elroy A. James, Judge
* * * * * *
**Judge Karen K. Herman**
* * * * * *

(Court composed of Judge Daniel L. Dysart, Judge Joy Cossich Lobrano, Judge Karen K. Herman)

**DYSART, J., CONCURS IN PART**
**LOBRANO, J., CONCURS**

Gregory Patrick Nichols
LAW OFFICE OF GREGORY P. NICHOLS, LLC
829 Baronne Street
New Orleans, LA 70113

     COUNSEL FOR PLAINTIFF/DEFENDANT-IN-RECONVENTION/
APPELLEE/CROSS-APPELLANT

Richard G. Duplantier, Jr.
Henry Weber
GALLOWAY, JOHNSON, TOMPKINS, BURR, & SMITH
701 Poydras Street
Suite 4040
New Orleans, LA 70139

     COUNSEL FOR DEFENDANT/PLAINTIFF-IN-RECONVENTION/
APPELLANT/CROSS-APPELLEE

     **AFFIRMED IN PART; REVERSED IN PART; AND RENDERED**
     **MAY 14, 2025**

KKH

Appellant/Cross-Appellee/Defendant/Plaintiff-in-Reconvention, Richard M. Ireland, Jr., ("Defendant"), appeals the trial court's April 16, 2024 judgment, which found that Defendant breached the lease agreement by failing to maintain the leased property in a condition suitable for habitation; ordered Defendant to pay Appellees/Cross-Appellant/Plaintiff/Defendant-in-Reconvention, Daisy Ellis, Lindsey Dubose, and Samantha Maza ("Plaintiffs") $1950, the amount for the advance rent paid for September 2021; dismissed Defendant's claim in reconvention that he is owed back rent payments for October 2021 to January 2022; and ordered that attorney's fees be considered at a separate proceeding.

Plaintiffs filed an answer to the appeal seeking modification of the trial court's April 16, 2024 judgment with respect to its finding that Plaintiffs abandoned the property; its denial of the return of Plaintiffs' security deposit and penalties under La. R.S. 9:3251, *et seq*.; and its failure to award Plaintiffs a dissolution of lease.

For the following reasons, the trial court judgment is affirmed in part and reversed in part. The judgment is affirmed with respect to its finding that Defendant failed to maintain the leased property in a condition suitable for

1

habitation; its award of the return of advance rent paid for September 2021; and its refusal to award Defendant rental payments for October 2021 through January 20, 2022; and the decision to consider the issue of attorney's fees at a later date. The judgment, however, is reversed with regard to its finding that Plaintiffs had abandoned the leased premises and in its refusal to award Plaintiffs penalties for Defendant's willful failure to remit the security deposit.

**FACTS AND PROCEDURAL HISTORY**

The parties entered into a lease in 2020 to rent property located at 7626 Plum Street, New Orleans, LA 70118. The lease was renewed for 2021, commencing June 1, 2021 and terminating May 31, 2022. Under the terms of the lease, the rent was $2050 a month. If the rent was paid by the third of the month, the rent was discounted to $1950. Also, a security deposit of $1950 was required.

On or about August 29, 2021, Hurricane Ida struck the City of New Orleans. Plaintiffs evacuated the premises before the hurricane hit. Daisy Ellis ("Ellis"), one of the plaintiffs, returned to the property on September 6, 2021 and discovered it was damaged.

Plaintiffs moved out of the residence on September 19, 2021. On September 24, 2021, Plaintiffs sent a letter to Defendant that they were vacating the leased property.

On February 15, 2022, Plaintiffs filed suit against Defendant for breach of lease, willful retention of security deposit, statutory penalties and attorney's fees. The petition alleged that due to significant property damages from the hurricane, the premises was no longer fit for the intended use. It further averred that Plaintiffs made numerous attempts to get Defendant to make repairs and that Defendant refused to acknowledge that mold was growing inside the residence. Plaintiffs

2

alleged that they had the home inspected by a mold inspector, which revealed that the presence of mold was "dangerously high." As a result, Plaintiffs claimed that Defendant breached the lease agreement and that they are entitled to the dissolution of the lease, the return of rent for September 2021, and the return of their security deposit plus penalties/fees.

Defendant filed a reconventional demand, alleging Plaintiffs breached the lease by abandoning the property. Defendant claimed that as a result of their abandonment, he is entitled to the rent lost from October 2021 through January 20, 2022; attorney's fees; and the retention of Plaintiffs' security deposit.

Trial on the matter commenced on February 29, 2024. At trial, Ellis and Teresa Dubose, the mother of plaintiff, Lindsey Dubose, testified on behalf of Plaintiffs. Dr. Joan Bennett, a fungal mold expert via video deposition, and Defendant testified on behalf of Defendant.

*Trial Testimony*

Ellis testified that she rented the Plum Street residence with her two roommates, Lindsey Dubose and Samantha Maza. She identified the lease agreement and it was entered into evidence. She testified that they submitted rent for September 2021 at the end of August.

Ellis testified that she evacuated for the hurricane on August 28, 2021. She returned to the property on September 6, 2021. She stated that she was "shocked" and "pretty upset" by the condition of the premises. Ellis said that the ceiling had come down in multiple rooms. She noted that there was a hole in the ceiling in her bedroom; there was water damage on the walls; "plaster and things where the ceiling had broken;" and that the residence smelled "very musty." She stated that the roof of the property had damage as well.

3

Ellis took several photographs of the property, which were identified and discussed at trial. The photographs depicted: the ceiling near the stairs on the second floor; a hole in the ceiling in Ellis' bedroom with visible ductwork; the living room ceiling with some dry wall repairs but with some gaps near the repaired section; the corner of the hallway, which Ellis stated showed staining, cracks on the wall, and some rippling in the paint due to water damage; some mold in the upstairs closet; "black mold" on the ceiling of the upstairs closet; a door in the home that was "black and spotty;" a ceiling vent surrounded by staining and cracks; and walls with paint peeling. Most of the photographs Ellis took the day she returned, but the photographs of the peeling paint, she took after a few days of being in the apartment. Ellis testified that the damage depicted in the photographs was not present when she had evacuated. She also noted that the spots shown in the photographs were "not dirt."

Ellis said that before returning to the property, Defendant had texted her that there was just some minor damage to the property. She identified and testified regarding text messages between her and Defendant.

Ellis stated that she had asked Defendant how many days the repairs would take before she returned and about the status of her bed, but he did not reply. Ellis said that after she got to the property she texted Defendant that the back of her closet is very wet and that "water seems to be seeping in the closet." She also stated that a lot of items, like clothes and bags, were wet. Ellis testified she decided to sleep in the hallway on an air mattress due to the damage to her bedroom ceiling.

Ellis texted Defendant on September 7, 2021, that she was "feeling uncomfortable because there's a bad smell coming from the corner and you can

4

smell it from the bathroom side of the wall." She then asked whether Defendant was "going to open up the wall and see what's really going on there." She also texted that she did not see a "damp spot" the previous day but that it had subsequently developed. Ellis said that she was concerned because while the roof was tarped, water was still seeping in. She stated that she communicated this information to Defendant because she was trying to understand how he was going to "deal with the wetness" and determine steps he would take to make the residence safe. Ellis said Defendant responded to her text message by asking her to "check the living room" for dripping water but Defendant did not give a timeline or otherwise reassure her about the work to be done.

Ellis then sent photographs of the upstairs closet to Defendant and informed him that Tulane had advised their students that "landlords should be working with a professional company like, Servpro, if any water intrusion occurs." She further texted Defendant that there appeared to be water damage in residence and that she would "feel better having someone come and fix all the issues so that they can be addressed properly." She stated that Defendant responded by asking questions about the photographs but did not address her request for professional evaluation. Ellis also texted him about her concerns of mold. The text stated that there was "black and blue dots all over that look[] like significant water damage from inside the wall[,] if not mold." Defendant responded: "is it wet now?" and Ellis advised "it feels damp and the DampRid in there was complete liquid."

Ellis noted that at some point Defendant advised her to use bleach to clean the mold, but that it did not correct the problem. She testified that after she would wipe the mold off, she could see "the black coming up within." She stated "I did

not feel like I was washing dirt." Ellis also noted that washing the mold off did not address her concern of water leaking potentially behind the walls.

She testified that Defendant eventually responded to her text regarding a professional inspector, stating she was welcome to have her own professional to assess the situation.[1] Defendant also stated he would dry, clean, and repair the physical damage in the property but again did not give her a timeline on the repairs.

Ellis testified that by September 10, 2021, Defendant had installed new sheetrock on the ceiling and that the roof was tarped but not repaired. She said the property was not painted and the cracks and staining had not been addressed. Ellis stated that it was "like a construction zone" dust everywhere and "not like a livable space." She said she was surprised to learn that Defendant had "considered the repairs complete by September 10th." Ellis noted that after sleeping in the leased property for a couple of days she began to feel ill.

She stated that the last night she spent in the house was September 10, 2021. Ellis said she left because she tried to talk to Defendant about her concerns about the house and felt like he was not taking it seriously, or taking the necessary steps to address the mold. Ellis also said that Plaintiffs had just gotten the results from the mold inspector, which indicated an "extremely high level of mold" and that the house required extensive repairs.

The record shows that Plaintiffs hired two mold companies, Sunshine Home and All Perils Flood-Fire-Mold Restoration, to inspect the property. Ellis testified

---

[1] The record suggests that one of the roommates had personal renters insurance. However, Ellis testified that they did not have insurance that would cover mold remediation.

that she got the inspection because she wanted to determine if the house was safe to live in.[2]

Ellis testified that on or about September 19, 2021, after she and her roommates had removed all of their belongings, they texted Defendant that they were getting new housing and a photograph of their keys on the kitchen counter.

She stated that Plaintiffs, through an attorney, sent a letter to Defendant on September 24, 2021, advising that they vacated the property because it was unsuitable for habitation. In their letter, Plaintiffs also requested the return of the September 2021 rent and their security deposit. Ellis testified that they did not receive a response to the letter within 30 days.

Ellis noted that it was not easy to find a lease in October as a student because most leases go from May to June and that "it was going to be a huge problem to have to move." She said she did not want to move out of the premises and did not find a cheaper place.

On cross-examination, when shown an October 1, 2021 letter from Defendant, Ellis admitted that Plaintiffs did in fact receive a response from Defendant within 30 days of their demand.[3]

---

[2] These inspections reports were not offered into evidence. However, Defendant's expert, Dr. Bennett refers to them and quotes portions of the inspections. Additionally, the parties do not appear to contest that the inspections occurred or that they indicated a presence of mold. Based on Dr. Bennett's reports, the report conducted by All Perils Flood-Fire-Mold Restoration indicated that mold at the property was at "uninhabitable levels," making cleanup at or near "condemnable" levels. It also provided that the cleanup costs would require a "massive up[ ] taking" of spraying the entire attic space, removal of all damaged drywall and plaster, and then treatment. The Sunshine Homes report stated that there was an "issue with toxic mold."

[3] The October letter is not contained in the record, however, both Ellis and Defendant provided testimony regarding the contents thereof. Additionally, according to Plaintiffs' counsel and his argument in closing argument, the October response letter was emailed to counsel but not received. Plaintiffs' counsel claimed that the email was likely "kicked out by Tulane's email server."

Ellis acknowledged that the security deposit agreement, offered into evidence by Defendant, stated that all debris should be removed from the unit and placed in appropriate containers. She testified that she believed that they had complied with this provision. She also testified that she complied with the provision requiring the lessee to clean the refrigerator, cabinets etc.

Ellis was questioned regarding several photographs taken by Defendant, which depicted: the yard and the curb of the property; a mattress on the curb; boxes on the stairs next to the trash; and a cooking pan. She testified that she believed by leaving the large items near the curb she believed she complied with the security deposit agreement.

Ellis admitted that they did not remove the sofa from the leased premises but noted that the sofa was left there from previous tenants. She did not feel that they had any obligation to remove it.

Ellis stated that the second tarp installed by Defendant was successful in stopping the rain coming through the attic but did not remedy the water coming from the walls.

She testified that she sprayed chlorine on the part of the closet to test it and determine if it would work. Ellis noted that in text she indicated to Defendant she would spray the mold but that she would prefer a professional to take a look.

Ellis testified that she expected Defendant to open walls to determine if there was leakage and taking out wet pieces, not just putting new pieces of plaster over it. She stated she did not feel that Defendant was "trustworthy" or that Defendant was "giving [her] the real information." Ellis noted that he had brought his wife over to scratch on the mold and tell her it was dirt.

8

Ellis admitted that she had "liked" the text message she received from Defendant noting the repairs to be done.

Theresa Dubose, Lindsey Dubose's mother, testified that she visited the Plum Street property on September 11, 2021. She stated there was obvious damage from the roof leak and that it smelled moldy. Dubose stated that immediately when she walked in, her eyes and throat were itchy and began coughing. Dubose testified that some things, like Ellis' ceiling, had been re-patched, and there was new drywall in the living room. She said there was still a hole near the stairwell and furniture was wet. She testified that she was not satisfied with the status of the work at that point. Dubose said she returned to the property on September 18, 2021, to help her daughter move out. She said the air quality was still poor.

Defendant testified when he inspected the property on or about September 1, 2022, he noticed what Plaintiff referred to as a hole but stated it was a "black layer above where the sheetrock was and above the joist." Defendant said that the back bedroom was damaged because sheetrock had fallen due to the weight of water. The roof was also damaged and he installed a tarp. Defendant said he placed another tarp around September 7 or 8, 2021 in response to Ellis' complaint of water intrusion. Defendant testified that subsequent to the placement of the second tarp there were no other leaks. He characterized the internal damage to the property as "very minor."

Defendant stated that he replaced the sheetrock in Ellis' bedroom around September 7, 2021. He said the power returned on September 5, 2021 and he was running the air conditioning to strip out the moisture. Defendant testified that he applied the mud to the sheetrock upstairs on September 8, 2021. He also installed sheetrock downstairs the same date.

9

Defendant testified that he did not observe anything he believed to be mold. He identified receipts for the expenses related to the Plum Street property and they were entered into evidence.

Defendant said prior to receiving notice from Plaintiffs that they were vacating the property, he had received no complaints about the speed of the repairs. Defendant said that the Plaintiffs had left furniture inside the home and left items "in the middle" of the front lawn. He stated some items were on the curb but that larger items were left in the middle of the yard. Defendant identified photographs of the lawn and a photograph of a cooking pan, which were introduced into evidence. He stated that Plaintiffs' actions had violated their security deposit agreement.

Defendant testified that he responded to Plaintiff's September 24, 2021 demand letter, explaining that the return of rent and security deposit was not appropriate. He stated that after the Plaintiffs left the residence, he only had "cosmetic work" to complete, like painting the walls and putting up ceiling fans. Defendant testified that based on the text message exchanges with Ellis, he believed he was addressing her concerns.

Defendant stated after Plaintiffs vacated the property, he was able to focus on other projects. He replaced the roof and refinished the floors in December 2021. Defendant testified that new tenants moved in on January 21, 2022.

On cross-examination, Defendant admitted he did not provide an itemization of damages in his October 1, 2021 response to Plaintiffs' demand letter. Defendant did not think that he had to provide an itemization because he deemed the leased property abandoned by Plaintiff and thus was not entitled to the return of the security deposit.

Defendant stated that he does not have personal knowledge that the furniture that was left on the lawn belonged to Plaintiffs but that it was left on their side of the property.

Defendant testified that he did not clean the joists or beams behind the damaged sheetrock, he just replaced the sheetrock. He said he never smelled mold on the property, but admitted he has a "non-sensitive nose."

Defendant admitted that he ordered mold mosquito fogger on September 23, 2022 for the Plum Street property two weeks after he deemed the work complete and after the Plaintiffs had already left. He also purchased mold control on September 26, 2021 and a moisture meter on September 29, 2021. Defendant also ordered Kilz, a low odor primer to paint the mudded sheet rock in November 2021. Defendant explained that after the received the mold results from Plaintiff, he purchased the anti-mold items as a precaution. He said he did not order these items in response to Plaintiffs' concerns for mold.

Defendant testified the spots in the closet, documented in Ellis' photograph, were not mold. He said he cleaned the spots with chlorine, but that it "acted like dirt [be]cause – you spray it and it runs – streaks down the wall" whereas Defendant indicated the chlorine would have changed the color of the mold.

Dr. Bennett, via her video deposition, testified that the EPA does not provide standards for mold levels. She stated "mold is not a unitary thing" that there are tens of thousands of species and "only very few of those species are dangerous." Dr. Bennett stated EPA does have guidelines for cleaning mold and said that in most cases there is no need for major remediation.

Dr. Bennett was shown four photographs of inside the property.[4] She testified that with respect to a photo of a corner of a closet, she observed "an example of bad housekeeping." She said it looks dirty and it was impossible to tell "whether there was microbial growth there." She said it looks like splattered water and dirt accumulation but indicated that there could be some microbial growth. Dr. Bennett testified that even assuming it was mold, it was minor and "something a person can clean up." She said the wood would not need to be replaced and you could wash it off to restore it for habitation. Dr. Bennett provided similar testimony regarding three additional photographs: the spots resembled dirt; that there could have some microbes in there but one cannot determine the presence of mold unless it was tested; that the residence was safe for human habitation. Based on the photographs she reviewed, Dr. Bennett testified that it was a minor mold problem and that it was remediated rapidly.

Dr. Bennett testified that when testing for mold inside a home, it is important to take a control sample, "which is an outside sample." She said "only if the level of mold inside the building is higher than the outside does the company say there's a problem." She noted that no outside sample was taken in either of the mold inspections obtained by Plaintiffs and that was a major flaw in the testing.

Dr. Bennett testified that mold inspection conducted by All Perils Flood-Fire-Mold Restoration took an air sample and a tape lift. She said that the report conducted by Sunshine Home Inspections, performed only one tape lift and no air samples were taken.

_____

[4] In her deposition, she described the content of the photograph. However, the photographs attached to her deposition black and white and are not discernable.

On cross-examination, Dr. Bennett testified that she did not conduct any mold testing at the property following the hurricane. She also admitted that she never met Plaintiffs and does not know if they would be susceptible to airborne mold contaminants. Dr. Bennett said she is not qualified to be a mold inspector, just an "expert on mold as an academician." She stated that she is not aware of any guidelines or requirements for mold testing that the reports failed to meet.

Dr. Bennett conceded that it was possible that mold growth may not be remediable by simply changing the drywall. She also stated that if a person reported an irritated nose or a strong odor, it is possible that there was mold growth in the structure that had not been treated. Dr. Bennett stated that once mold is cleaned, that colony is dead. She admitted that if water intrusion continues new mold growth is possible.

Dr. Bennett noted that in her report, she stated that "the landlord did not need to use any professional remediation company, and the majority of the repair work was completed within approximately two weeks of the storm." She noted that the mold was cleaned and the roof was tarped. Dr. Bennett admitted this statement was based on the representations made by Defendant.

The expert report of Dr. Bennett, wherein she criticized and discussed the mold inspections and provided her own analysis, was attached to her deposition.

Following trial, the trial court took the matter under advisement. On April 16, 2024, the trial court issued judgment, which found as follows:

> [T]he courts finds that the Plaintiffs, Daisy Ellis, Lindsey Dubose, and Samantha Maza, have submitted sufficient evidence establishing that Defendant, Richard M. Ireland, Jr. breached the lease when Defendant failed to maintain the Lease Property in a condition suitable for habitations in accordance with Louisiana law. As such, the court issues the following judgment:

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the court finds in favor of the Plaintiffs, Daisy Ellis, Lindsey Dubose, and Samantha Maza, and against Defendant, Richard M. Ireland, Jr., in that Plaintiffs are entitled to a return of advance rent paid for September 2021. Defendant shall pay Plaintiffs $1950, an amount equal to the advance rent paid for September 2021.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the court finds the Plaintiffs, Daisy Ellis, Lindsey Dubose, and Samantha Maza, do not have a claim under the Lessee's Security Deposit Act when the Plaintiffs abandoned the Leased Property prior to May 31, 2022, lease termination date. Therefore, the claim for the return of the security deposit is denied.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the court finds that the Reconventional Defmdand filed by Defendant, Richard M. Ireland, Jr. – for back rent payments for the months of October 2021 through January 20, 2022 – is without merit.

\*\*\*

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the issue of attorney's fees remains open and will be considered in a separate proceeding.

The trial court also issued reasons for judgment the same date.

On April, 30, 2024, Plaintiff filed a motion for partial new trial, which the trial court denied on July 23, 2023.[5]

Both Defendant and Plaintiff appealed aspects of the judgment.

**APPLICABLE LAW AND DISCUSSION**

*Standard of Review*

"Factual determinations are subject to the manifest error standard of review." *Wootan & Saunders v. Diaz*, 2017-0820, p. 5 (La. App. 4 Cir. 3/28/18), 317 So.3d 390, 395 (citing *Stobart v. State, through DOTD*, 617 So.2d 880, 882

---

[5] Although the notice of judgment is dated April 16, 2024, the parties agree that the judgment was actually mailed on April 22, 2024. Thus, the motion for new trial and subsequent appeal is timely. *See* La. C.C.P. art. 4907(B) (stating "[w]here notice of judgment is required, a party may file a motion for a new trial not later than seven days, exclusive of legal holidays, after the clerk has mailed, or the sheriff has served, the notice of judgment").

(La. 1993)). "Similarly, mixed questions of law and fact are reviewed under the manifestly erroneous standard of review." *Id.* (citing *Chimneywood Homeowners Ass'n, Inc. v. Eagan Ins. Agency, Inc.*, 2010-0368, p. 5 (La. App. 4 Cir. 2/2/11), 57 So.3d 1142, 1146). "In order to reverse a fact finder's determination of fact, an appellate court must find from the record that a reasonable factual basis does not exist for the finding and that the record establishes that the finding is clearly wrong." *Id.* (citing *Stobart*, 617 So.2d at 882).

Additionally, under the manifest error or clearly wrong standard of review, "[w]here there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." *Ratliff v. LSU Bd. of Supervisors*, 2009-0012, 0013, 0014, p. 6 (La. App. 4 Cir. 5/7/10), 38 So.3d 1068, 1074 (citing *Foley v. Entergy La., Inc.*, 2006-0983, p. 10 (La. 11/29/06), 946 So.2d 144, 153).

**Defendant's Appeal**

Defendant argues that the trial court erred in finding: that Defendant breached the lease and failed to maintain the lease property in suitable condition; that Defendant owed the advance rent payment for September 2021 to Plaintiffs; and that Plaintiffs did not owe rent for October 2021 through January 20, 2022. Defendant further argues that the trial court erred in failing to award attorney's fees under the lease and in denying his request for attorney's fees pursuant to La. R.S. 9:3253.

*Defendant's Duty to Maintain*

La. C.C. art. 2668 provides that a "[l]ease is a synallagmatic contract by which one party, the lessor, binds himself to give to the other party, the lessee, the

use and enjoyment of a thing for a term in exchange for a rent that the lessee binds himself to pay."

"Louisiana law places certain duties on the lessor." *Growe v. Johnson*, 2020-0143, p. 10 (La. App. 4 Cir. 2/17/21), 314 So.3d 87, 96. "The lessor is bound: (1) To deliver the thing to the lessee; (2) To maintain the thing in a condition suitable for the purpose of which it was leased; and (3) To protect the lessee's peaceful possession for the duration of the lease." *Id.* (quoting La. C.C. art. 2682). "During the lease, the lessor is bound to make all repairs that become necessary to maintain the thing in a condition suitable for the purpose for which it was leased, except those for which the lessee is responsible." *Id.* (quoting La. C.C. art. 2691). "A landlord cannot escape its responsibility to repair defects where it had actual notice of those defects[.]" *Nola E., LLC v. Sims*, 2018-0623, p. 6 (La. App. 4 Cir. 2/13/19), 265 So.3d 1147, 1151 (quoting *Ganheart v. Exec. House Apartments*, 1995-1278, p. 8 (La. App. 4 Cir. 2/15/96), 671 So.2d 525, 530).

Defendant claims the leased property was in a condition suitable for habitation thus he did not breach the lease agreement. However, based on the evidence and the testimony contained in the record, we find that the trial court was not manifestly erroneous in determining that Defendant breached his duty to maintain the property suitable for its intended use.

Ellis provided ample testimony regarding the physical damage the property sustained as well the ongoing moldy and wet conditions within the property. Further, the mold inspection reports obtained by Plaintiffs indicated that there was extreme contamination, toxic mold, and that remediation thereof would be extensive. Moreover, as the trial court noted in its reasons for judgment, it was not

16

until Plaintiffs had vacated the property that Defendant took actions to treat the presence of mold of which Ellis complained.

Furthermore, while Dr. Bennett offered general academic observations regarding mold and potential remediation methods, her testimony was based solely on a limited set of photographs that were black and white copies and secondhand summaries of inspection reports. This significantly diminished the probative value of her conclusions.

Additionally, Dr. Bennett admitted that she was not a licensed mold inspector and that if the property emitted strong odors and residents reported symptoms of irritation, it was "possible" that unaddressed mold growth remained. She further conceded that her conclusions that repairs to the property were adequate was premised on the Defendant's own representations rather than independent verification. These admissions highlight the trial court's reasonable basis for finding the Plaintiffs' lay testimony more credible and persuasive.

In evaluating expert testimony, "the trier of fact may accept or reject any expert's opinion, in whole or in part, and may substitute its common sense and judgment for the expert's opinion when the substitution appears warranted on the record as a whole." *Johnston v. Vincent*, 2021-01196, p. 29 (La. 2/1/23), 359 So.3d 896, 916 (citing *Ryan v. Zurich Am. Ins. Co.,* 2007-2312, p. 12 (La. 7/1/08), 988 So. 2d 214, 222); *see also Pollard v. Schiff*, 2013-1682, p. 13 (La. App. 4 Cir. 2/4/15), 161 So.3d 48, 56-57. "Where the factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous." *Snider v. Louisiana Med. Mut. Ins. Co.*, 2014-1964, p. 5 (La. 5/5/15), 169 So.3d 319, 323.

The trial court was well within its discretion to find that the conditions rendered the property uninhabitable, and that Defendant's response though perhaps cosmetically sufficient did not meet his legal duty under La. C.C. art. 2691.  As such, the trial court did not err in finding Defendant breached his duty to maintain the premises in a habitable condition.[6] Defendant's assignment of error in this regard lacks merit.

### *Rental Payments for Plaintiffs' Breach*

Defendant claims that Plaintiffs breached the lease agreement when they abandoned the property and failed to pay rent.[7] Defendant notes that the lease provided: "Should the Tenant fail to pay the rent … Tenant shall be at the option of Landlord in default." It further provided that: "Tenant shall not be entitled to a reduction of the monthly rent or cancellation of lease because of … a reasonable delay in completing agreed upon replays to improvement as to the premises." Ellis admitted at trial that they did not pay rent after September 2021 as a result of the property damages from the hurricane and inhabitable condition of the premises.

However, because the record shows that Defendant breached its obligation to maintain the property in a condition suitable for its intended use, the trial court did not err in ordering Defendant to return the September 2021 rent and declining

---

[6] In *Growe,* 2020-0143, 314 So.3d 87, an apartment flooded on several occasions. The landlord made repairs, including replacing the leaky pipe, installing new sheetrock, and cleaning flooded areas with a wet-vacuum. However, the landlord failed to properly fix the flooding issue or effectively clean the apartment. As a result, mold began to grow and damaged the tenant's furniture. The trial court found the damage to the tenant's furniture was caused solely by the landlord. This Court affirmed, noting that the landlord breached its duty to maintain the property for suitable use when he repeatedly failed to fix the water intrusion issues. *Id*. at pp., 10-11, 314 So.3d at 96.

[7] The Plaintiffs' alleged abandonment of the premises will be addressed later herein.

to award Defendant in lost rental payments from October 2021 through January 20, 2022.[8]

*Attorney's Fees*

The decision to award attorney's fees is within the sound discretion of the trial court. *See St. Bernard Port, Harbor & Terminal Dist. v. Guy Hopkins Const. Co.,* 2012-0167, p. 26 (La .App. 4 Cir. 1/16/13), 108 So.3d 874, 889.

Defendant argues that the trial court erred in declining to award attorney's fees as provided for in the lease. The lease provides, in part:

> ATTORNEY'S FEES: Tenant further agrees that if an attorney is employed to protect any rights of the Landlord hereunder Tenant will pay the fee of such attorney. Such fee is hereby fixed at Twenty Five (25%) percent of the amount claimed or $500.00, whichever is greater. Tenant further agrees to pay all court costs and sheriff's charges, if any.

Defendant claims that because he was forced to retain an attorney to protect his rights he is entitled to attorneys' fees.

Defendant further claims that it is entitled to fees pursuant to La. R.S. 9:3253, which states: "[i]n an action brought under La. R.S. 9:3252, the court may in its discretion award costs and attorney's fees to the prevailing party." Defendant claims that because the trial court found that Plaintiffs abandoned the property and

---

[8] Defendant also notes in his brief that Plaintiffs left furniture on the front lawn in violation of the security deposit agreement. The security deposit agreement stated that [a]ll debris, rubbish and discards" must be "removed from the unit and placed in appropriate containers." However, Defendant failed to show Plaintiffs breached this provision. The photographs depict some pieces of furniture, a mattress, and some trash bags on the lawn near the curb of the street. There were also boxes, items, and a headboard placed closer to the residence by a trash can. Ellis testified that it was common after the hurricane to dispose of damaged items by the curb. There is no proof that all of the debris contained in the photographs was owned by Plaintiffs. She stated that many of their neighbors also placed items near the curb. Ellis also did not recognize some furniture pieces or the pan as belonging to Plaintiffs. Also, while the record reflects that a sofa was left inside the premises, Ellis testified that the sofa belonged to the previous tenant and was present when Plaintiffs had initially moved in. Also, a violation of the security deposit agreement relates to Defendant's retention of the deposit, which is discussed below.

was forced to defend against Plaintiffs' claim for security deposit, Defendant is entitled to attorney's fees under the statute.

However, as discussed below, we find that the trial court was manifestly erroneous in concluding that Plaintiffs abandoned the premises when it was unfit for habitation and thus Defendant would not be entitled to attorney's fees under La. R.S. 9:3253. Moreover, the judgment of the trial court stated the "issue of attorney's fees remains open and will be considered in a separate proceeding." As such, to the extent Defendant is owed attorney's fees under the terms of the lease, because the trial court reserved the award of attorney's fees for future adjudication it is premature to address that issue at this point in the proceedings. This assignment of error lacks merit.

**Plaintiffs' Cross-Appeal/Answer**

Plaintiffs argue that the trial court erred in: concluding that they abandoned the lease; in refusing to award the return of the security deposit and penalties under La. R.S. 9:3253; and in declining to dissolve the lease under La. C.C.P. art. 2715.

***Lessee's Deposit Act***

Louisiana Revised Statute 9:3251, *et seq.* (the "Lessee's Deposit Act") is a set of laws meant to protect lessees from the arbitrary retention of their security deposits by the lessors." *Growe v. Johnson*, 2020-0143, p. 19 (La. App. 4 Cir. 2/17/21), 314 So.3d 87, 101 (citing *Webapps, L.L.C. v. Murdock,* 2016-0092 p. 4-5 (La. App. 4 Cir. 6/29/16), 196 So.3d 765, 768). "The Lessee's Deposit Act provides the lessee a legal process to recover the security deposit, as well as attorney fees." *Id*. (citing *Webapps,* 196 So.3d at 768; *Curtis v. Katz*, 349 So.2d 362, 364 (La. App. 4th Ct. 1977)).

La. R.S. 9:3251 provides, in part:

A. Any advance or deposit of money furnished by a tenant or lessee to a landlord or lessor to secure the performance of any part of a written or oral lease or rental agreement shall be returned to the tenant or lessee of a residential or dwelling premises within one month after the lease shall terminate, except that the landlord or lessor may retain all or any portion of the advance or deposit which is reasonably necessary to remedy a default of the tenant or to remedy unreasonable wear to the premises. If any portion of an advance or deposit is retained by a landlord or lessor, he shall forward to the tenant or lessee, within one month after the date the tenancy terminates, an itemized statement accounting for the proceeds which are retained and giving reasons therefor. The tenant shall furnish the lessor a forwarding address at the termination of the lease, to which such statements may be sent.

. . .

C. Paragraph A of this Section shall not apply when the tenant abandons the premises, either without giving notice as required or prior to the termination of the lease.

(emphasis added).

La. R.S. 9:3252(A) provides:

The willful failure to comply with R.S. 9:3251 shall give the tenant or lessee the right to recover any portion of the security deposit wrongfully retained and three hundred dollars or twice the amount of the portion of the security deposit wrongfully retained, whichever is greater, from the landlord or lessor, or from the lessor's successor in interest. Failure to remit within thirty days after written demand for a refund shall constitute willful failure.

(emphasis added).

*Abandonment of Lease*

As the trial court observed in reasons for judgment, the Lessee's Security Deposit Act does not apply "when the lessee abandons the premises prior to the termination of the lease." *See* La. R.S. 9:3251(C). The trial court noted that Plaintiffs vacated the leased property on September 19, 2021 and that they notified Defendant on September 24, 2024. However, the trial court noted that while Ellis resided in the premises days after her September 6, 2021 return, the other tenants never returned to the lease property. The trial court, as a result, concluded that "[i]t

21

is without question that Plaintiffs abandoned the premises before the end of the lease that termination on May 31, 2022."

Plaintiffs argue that they did not "voluntarily" relinquish possession nor did they intend to abandon the property. They contend that they gave every opportunity to Defendant to restore the property (i.e., sleeping for days in a moldy damp apartment on the hall on an air mattress) before surrendering the property only when it was apparent Defendant was unwilling to recognize the uninhabitable condition of the premises. Plaintiffs also claim there was no intent to abandon and that they considered the lease breached due to the failure of Defendant to restore the property to habitability. Plaintiffs' arguments are persuasive.

"Abandonment of a leased premise 'requires voluntary relinquishment of the premises by the lessee with the intent to terminate without vesting ownership in another.'" *Duhon v. Briley*, 2012-1137, p. 5 (La. App. 4 Cir. 5/23/13), 117 So.3d 253, 258 (quoting *Girgis v. Macaluso Realty Co.*, 2000-0753, p. 4 (La. App. 4 Cir. 1/31/01), 778 So.2d 1210, 1213). Whether a leased premise has been abandoned is a finding of fact subject to the manifest error-clearly wrong standard of review. *Duhon v. Briley,* 2012-1137, pp. 5-6 (La. App. 4 Cir. 5/23/13), 117 So.3d 253, 258 (citing *Girgis,* 00–753, pp. 4–5, 778 So.2d at 1213).

Ellis testified at trial that she did not want to leave the premises and that it was a burden to move but that she was concerned about the presence of mold and Defendant's commitment to fully repair the property. There was also testimony indicating that water was seeping from the walls subsequent to the installation of the tarp and the new sheetrock. Moreover, while Defendant and Ellis were in communication about the property damages, Ellis stated that Defendant did not give her an estimate on when the repairs would be complete. Ellis also testified that

Defendant was dismissive about her concerns of mold and water intrusion. Moreover, both Ellis and Dubrose stated that there was moldy odor inside the residence. Ellis stated that the property was not livable and resembled a construction zone. Additionally, the home inspection reports stated that there was "extreme contamination" and that the mold in the premises was at "uninhabitable levels." One report noted that the clean-up costs would be a "massive undertaking."

As such, we find that Plaintiffs did not intend on abandoning the property. Plaintiffs vacated the property after Ellis had been living in the property for days without an accurate timeline of when the property would be restored and after receiving inspection reports regarding the toxic mold presence and the extensive repairs to remediate the premises. The trial court therefore abused its discretion in finding that Plaintiffs had abandoned the leased premises.

*Return of Security Deposit & Penalties*

As noted above, La. R.S. 9:3251(A) of Lessee's Deposit Act provides that "[i]f any portion of an advance or deposit is retained by a landlord or lessor, he shall forward to the tenant or lessee, within one month after the date the tenancy terminates, an itemized statement accounting for the proceeds which are retained and giving reasons therefor." La. R.S. 9:3252(A) states that the "willful failure" to remit the security deposit "shall give the tenant or lessee the right to recover any portion of the security deposit wrongfully retained and three hundred dollars or twice the amount of the portion of the security deposit wrongfully retained, whichever is greater, from the landlord or lessor." Furthermore, the "[f]ailure to remit within thirty days after written demand for a refund shall constitute willful failure." *Id*.

"Louisiana jurisprudence has consistently held that a lessee is not entitled to damages pursuant to willful failure to comply with La. R.S. 9:3251 if a written demand for the return of the security deposit was not issued." *Growe v. Johnson*, 2020-0143, p. 20 (La. App. 4 Cir. 2/17/21), 314 So.3d 87, 101–02 (citing *Trapani v. Morgan*, 426 So.2d 285, 291 (La. App. 4th Ct. 1983); *Maxie v. Juban Lumber Co.*, 444 So.2d 181, 183 (La. App. 1st Ct. 1983)).

Plaintiffs argue that when the trial court found Defendant breached the lease for failing to maintain the property in a habitable condition and awarded Plaintiffs the September 2021 rent, the trial court effectively found that the lease ended on August 29, 2021 as a result of the hurricane, before Plaintiffs vacated the property and gave Defendant notice. As a result, Plaintiffs claim that Defendant had to refund the security deposit or provide an itemized statement. Because Defendant did neither, Plaintiffs argue that they are entitled to their security deposit of $1,950 plus twice the amount (or $3,900) as statutory penalties.

The record shows that Plaintiffs sent a written demand for security deposit as required. While Defendant responded to the demand within thirty days, he conceded at trial that he did not provide an itemized statement accounting for the retained proceeds.[9] Defendant insisted that no security deposit was due because Plaintiffs had abandoned the property and left their belongings.

Nevertheless, La. R.S. 9:3252(A) specifically states that the failure to submit the security deposit "within thirty days after written demand for a refund shall constitute willful failure." Additionally, it is "well settled that even if there is a valid dispute over a lease, a lessor must comply with the statute or suffer the

_____

[9] *See* n. 3

24

penalties provided." *Woodery v. Smith*, 527 So.2d 389, 390 (La. 4th Cir. App. 1988) (citing *Altazin v. Pirello*, 391 So.2d 1267, 1269 (La. App. 1st Cir.1980).

Here, because Defendant failed to remit a refund after a written demand from Plaintiffs and failed to provide an itemized statement, he willfully failed to comply with La. R.S. 9:3251. *See Webapps, L.L.C.* 2016-0092, p. 11, 196 So.3d at 771 (affirming the trial court's award under La. R.S. 9:3252 when the lessee made a written demand for security deposit and the lessor failed to provide a timely itemized statement of amount withheld); *but see Growe*, 2020-0143, p. 21, 314 So.3d at 102 (denying damages under La. R.S. 9:3252 when the lessee failed to make a written demand but permitting the return of security deposit wrongfully withheld). As such, Plaintiffs are entitled to "recover any portion of the security deposit wrongfully retained and three hundred dollars or twice the amount of the portion of the security deposit wrongfully retained, whichever is greater." La. R.S. 9:3252(A). The greater of the two is twice the amount of security deposit for a total of $3,900. Plaintiffs are thus entitled to $3,900 in statutory penalties. Accordingly, the trial court erred in declining to award Plaintiffs penalties for Defendant's willful retention of the security deposit.

***Dissolution of the Lease***

La. C.C. art. 2715 provides for the dissolution of the lease when the thing is partially destroyed and states:

> If, without the fault of the lessee, the thing is partially destroyed, lost, or expropriated, or its use is otherwise substantially impaired, the lessee may, according to the circumstances of both parties, obtain a diminution of the rent or dissolution of the lease, whichever is more appropriate under the circumstances. If the lessor was at fault, the lessee may also demand damages.

25

If the impairment of the use of the leased thing was caused by circumstances external to the leased thing, the lessee is entitled to a dissolution of the lease, but is not entitled to diminution of the rent.

The trial court, in its reasons for judgment, determined that Plaintiffs were not entitled to a dissolution because neither party agreed to a dissolution of the lease nor did either party file suit request relief, citing *727 Toulouse, L.L.C. v. Bistro at the Maison De Ville, L.L.C.*, 2012-1014 (La. App. 4 Cir. 8/21/13), 122 So.3d 1152. In *Toulouse*, a tenant refused to pay rent and remained in possession of the premises after the lessor removed two HVAC units from the premises, contending that the removal of the units substantially impaired its use of the premises. The Fourth Circuit affirmed a judgment of eviction. The Court also declined to allow dissolution or diminution of rent because the tenant failed to seek relief judicially. The Court stated:

> We find that the provision in La. C.C. art. 2715 stating that "the lessee may, according to the circumstances of both parties, obtain a diminution of the rent or dissolution of the lease" could be interpreted to allow the lessee to obtain the diminution or dissolution by agreement of both parties or to seek and obtain the appropriate remedy by suit, but the lessee's unilateral decision to refuse to pay rent and remain in occupancy of the premises was an improper "self-help" remedy.

*727 Toulouse, L.L.C. C.*, 2012-1014, p. 17, 122 So.3d 1152, 1162–63.

Plaintiffs, however, note that contrary to the trial court's statement, that they did pray for dissolution and thus the trial court's reliance on *Toulouse* is misplaced.[10]

The record shows that the use of the property was substantially impaired as a result of the hurricane and thus was not the fault of either party. Also, as noted by

---

[10] Defendant, citing *Toulouse*, argues that La. C.C. art. 2517 does not allow "self-help" remedies and merely allows the lessee to obtain reduced rent or dissolution. Defendant notes that Plaintiffs did not seek judicial action to dissolve the lease before they had left the premises.

Plaintiffs, they did seek dissolution of the lease in their petition for damages. However, because the lease was essentially terminated as result of the August 2021 hurricane and the property has since been leased by other tenants, we do not find that a judicial dissolution of the lease is warranted.

**CONCLUSION**

For the above stated reasons, the trial court judgment should be affirmed in part and reversed in part. The judgment is affirmed with regard to its finding that Defendant failed to maintain the leased property in a condition suitable for habitation; its award of the return of advance rent paid for September 2021; its refusal to award Defendant rental payments for October 2021 through January 20, 2022; and its decision to reserve the attorney's fees issue for future adjudication. However, the judgment is reversed with respect to its finding that Plaintiffs had abandoned the leased premises and in its refusal to award Plaintiffs statutory penalties for Defendant's failure to remit the security deposit. We thus award Plaintiffs $3,900 in penalties under La. R.S. 9:3252.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED**